# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ON-NET SURVEILLANCE SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 1:15-CV-06653-JGK |
| v. | ) | |
| | ) | |
| HAWK TECHNOLOGY SYSTEMS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**HAWK'S MOTION TO DISMISS AMENDED COMPLAINT [CM/ECF 21]**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  FACTS ...............................................................................................................2

    A.  OnSSI Sued Hawk For A Declaration Of Non-Infringement, Invalidity, Intervening Rights, License and Exhaustion Related To U.S. Patent No. RE43,462 (The "Patent")......2

    B.  Hawk Is A Florida Company, The Patent Prosecution Attorney Resides In Florida And Hawk Has No Offices Or Employees In New York....................................................2

    C.  Hawk's Litigation History Makes Clear It Does Not Sue Video Management Software Manufacturers Such As OnSSI..................................................................................3

    D.  Hawk Covenants Not To Sue OnSSI ....................................................................4

    E.  Hawk's Only Contacts With New York Have Been Federal Court Lawsuits....................4

    F.  OnSSI Disclaims The Implied Warranty Of Non-Infringement In Its Form Customer Contract ...............................................................................................................4

    G.  OnSSI Received A Customer Request For Indemnity And OnSSI Refused To Acknowledge Any Indemnity Obligation In Response ...................................................5

III.   ARGUMENT .......................................................................................................5

    A.  This Court Does Not Have Subject Matter Jurisdiction And OnSSI Does Not State A Claim ...................................................................................................................5

        1.  No Subject Matter Jurisdiction Exists Because There Is No Actual Controversy Between The Parties ..................................................................................6

        2.  OnSSI Does Not Have Declaratory Judgment Standing Merely Because its Customers May be Sued.............................................................................................7

            i.  OnSSI's Allegation Of An Obligation to Indemnify Is Conclusory And Unsupportable.................................................................................8

            ii.  A Customer Request For Indemnification Is Insufficient. ...........................8

            iii.  OnSSI's Mere Adverse Economic Interest Is Insufficient To Confer Standing .........10

    B.  Defendant Failed To Join An Indispensable Party .........................................................11

    C.  This Court Does Not Have Personal Jurisdiction Over Hawk .........................................13

        1.  New York's Long-Arm Statute Does Not Reach Hawk ...............................................14

            i.  Hawk Does Not Transact Business In New York ....................................................15

            ii.  This Suit Does Not Arise Out Of Hawk's New York Lawsuits................................16

    D.  Venue Is Improper ...................................................................................................18

        1.  § 1391(b)(1) Is Not Satisfied Because Defendant Does Not Reside In This District.....18

2.   § 1391(b)(2) Is Not Satisfied Because A Substantial Part Of The Events Giving Rise to Plaintiff's Request For Declaratory Relief Did Not Occur In This District .................19

3.   § 1391(b)(3) Is Not Satisfied Because This Court Lacks Personal Jurisdiction Over Defendant And There Are Other Districts Where This Case May Be Brought.............19

E.   OnSSI's Exhaustion Count Should Also Be Dismissed Under Rule 12(b)(6)...................20

F.   OnSSI's Complaint Should Be Dismissed As A Matter of Equitable Discretion Under 28 U.S.C. § 2201(a) .........................................................................................................20

IV.   CONCLUSION ........................................................................................................21

## TABLE OF AUTHORITIES

**Cases**

*Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1091 (Fed. Cir. 1987) ......................12

*Arris Group, Inc. v. British Telecommunications PLC*, 639 F.3d 1368, 1380 (Fed. Cir. 2011) .....6

*Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 764 (2d Cir. 1983) .....................................15, 16

*Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007)..................6, 10

*Blauschild v. Tudor*, 31 F.3d 527, 530–31 (E.D.N.Y. 2014) .......................................................18

*Blonder–Tongue Lab. v. Univ. of Illinois*, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788
   (1971)..........................................................................................................................................12

*Brocklesby Transport v. Eastern States Escort Servs.*, 904 F.2d 131, 133 (2d Cir. 1990) ...........11

*Caldwell Mfg. Co. v. Unique Balance, Co.*, 18 F.R.D. 258, 263 n.17 (S.D.N.Y. 1955)...............12

*Card Activation Techs. v. Pier 1 Imports, Inc.*, No. 09C2021, 2009 WL 2956926 (N.D. Ill. Sept.
   14, 2009) .....................................................................................................................................13

*CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 777 F.Supp.2d 454, 461 (E.D.N.Y. 2011)...........8

*Cohen v. BMW Invs. L.P.*, No. 15-cv-3154, 2015 WL 6619958 (S.D.N.Y Oct. 30, 2015) ..........14

*Commil USA, LLC v. Cisco Sys., Inc.*, 135 S.Ct. 1920, 1926 (2015) .............................................3

*Daimler AG v. Bauman*, 134 S.Ct. 747, 760 (2014) ....................................................................14

*Database America, Inc. v. Bellsouth Advertising & Pub. Corp.*, 825 F.Supp. 1216 (D. N.J. 1993)
   ....................................................................................................................................................19

*Dow Jones & Co., Inc. v. Ablaise Ltd.,* 606 F.3d 1338, 1348 (Fed. Cir. 2010)..............................6

*Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) ..................................13

*Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948)......................................................................20

*Ehrenfeld v. Mahfouz*, 518 F.3d 102, 104 (2d Cir. 2008) ......................................................15, 16

*E-Z Bowz, LLC v. Prof'l Prod. Research Co., Inc.*, No. 00-CUV-8670, 2003 WL 22064259
   (S.D.N.Y. Sept. 5, 2003)..............................................................................................................15

*Fagioli S.p.A. v. Gen. Elec. Co.*, 2015 WL 3540848, No. 14-cv-7055 (S.D.N.Y. June 2, 2015) .11

*Friedman v. Wahrsager*, 848 F.Supp.2d 278, 304 (E.D.N.Y. 2012)...........................................12

*Global–Tech Appliances, Inc. v. SEB S.A.,* —— U.S. ——, 131 S.Ct. 2060, 2068, 179 L.Ed.2d
   1167 (2011)...................................................................................................................................7

*Grant River Enters. Six Nations Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005).......................14

*Graphic Controls Corp. v. Utah Medical Products, Inc.*, 149 F.3d 1382, 1385-1386 (Fed. Cir.
   1998)...........................................................................................................................................14

*Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005)................................................18

*Hilton Hotels Corp. v. Damornay Antiques, Inc.*, 99 CIV. 4883 (MBM), 1999 WL 959371
   (S.D.N.Y. 1999) ..........................................................................................................................5

*In re Laughlin Products, Inc.*, 265 F.Supp.2d 525, 537 (E.D. Pa. 2003)....................................13

*In re Old Carco LLC*, 530 B.R. 614, 620–21 (S.D.N.Y. 2015)...................................................12

*Int'l Communications, Inc. v. Rates Technology, Inc.*, 694 F. Supp. 1347 (E.D. Wisc. 1988).....19

*Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1341 (Fed. Cir. 2001) ...................................................................................................9

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille*, 937 F.2d 44,51 (2d Cir. 1991) ..............................................................................................................................18

*KVH Indus., Inc. v. Moore*, 789 F. Supp. 69, 73 (D.R.I. 1992)...............................................19

*Lake Minnewaska Mountain Houses, Inc. v. Lehman*, 88-CV-685, 1988 WL 142769 (N.D.N.Y. 1988)..............................................................................................................................5

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) ...........................................5

*Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1571 (Fed.Cir.1993)......................................12

*Microchip Tech. Inc., v. Chamberlain Group, Inc.*, 441 F.3d 936, 943 (Fed. Cir. 2006)6, 8, 10, 11

*Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014)............................7, 8, 10

*Modern Computer Corp. v. Ma*, 862 F.Supp. 938, 946-947 (E.D. NY 1994).......................18, 19

*Motor Vehicle Acc. Indem. Corp. v. Nat'l Grange Mut. Ins. Co.*, 270 N.Y.S.2d 245, 247 (N.Y. App. Div. 1966)..............................................................................................................12

*Ours Tech., Inc. v. Data Drive Thru, Inc.*, 645 F. Supp. 2d 830, 839 (N.D. Cal. 2009)...............10

*Pieczenik v. Dyax Corp.*, No. 00 cv 243, 2000 WL 959753 (S.D.N.Y. July 11, 2000)...............16

*Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962) ............................................20

*Quanta Computer, Inc. v. LG Electronics, Inc.*, 533 U.S. 617 (2008).........................................20

*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1358 (Fed. Cir. 1998) .......14

*Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999).....................................................13

*Shuffle Tech International, LLC v. Scientific Games Corporation*, 2015 WL 5934834 (N.D. Ill. 2015)........................................................................................................................10

*Streck, Inc. v. Research & Diagnostic Systems, Inc.*, 665 F.3d 1269, 1281-84, 101 U.S.P.Q.2d 1225 (Fed. Cir. 2012) .......................................................................................................6

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995)............6

*Tamam v. Fransabank Sal*, 677 F.Supp.2d 720, 726 (S.D.N.Y. 2010).......................................15

*The Bank of New York v. First Millennium, Inc.*, No. 06-civ-13388, 2007 WL 1404433 (S.D.N.Y. May 9, 2007) ......................................................................................................15

*Unistrut Corp. v. Baldwin*, 815 F. Supp. 1025 (E.D. Mich. 1993)............................................19

*Visto Corp. v. Sproqit Techs., Inc.*, No. C–04–0651 EMC, 2006 U.S. Dist. LEXIS 96173 (N.D.Cal. Oct. 4, 2006)........................................................................................................8

*Wallert v. Atlan*, No. 14 Civ. 4099, 2015 WL 6459219 (S.D.N.Y. Oct. 26, 2015)....................14

*White v. Nationwide Mut. Ins. Co.*, 644 N.Y.S.2d 590, 591 (N.Y. App. Div. 1996)....................12

*Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) ...............................................................20

*Zemel Bros. v. Dewey Elecs. Corp.*, 218 U.S.P.Q. 722, 724 (N.D.N.Y. 1982)............................13

*Zeneca Ltd. v. Mylan Pharms., Inc.*, 173 F.3d 829, 831 (Fed. Cir. 1999) ..................................17

**Statutes**

28 U.S.C. § 1391...................................................................................................................18

28 U.S.C. § 2201(a) ........................................................................................................5, 20

**Rules**

Fed. R. Civ. P. 12(b)(3)........................................................................................18
Fed. R. Civ. P. 17(a)(1)........................................................................................11
Fed. R. Civ. P. 19(a)(1)(B)(ii) ............................................................................13
Fed.R.Civ.P. 12(b)(1)...........................................................................................5
Fed.R.Civ.P. 12(b)(1) and (6).............................................................................1
Fed.R.Civ.P. 12(b)(2)-(3)....................................................................................2
Fed.R.Civ.P. 12(b)(6)...........................................................................................5
Fed.R.Civ.P. 12(b)(7)...........................................................................................1

## HAWK'S MOTION TO DISMISS AMENDED COMPLAINT [CM/ECF 21]

Pursuant to Fed.R.Civ.P. 12(b)(1)-(3) and (6)-(7), Defendant, Hawk Technology Systems, LLC, ("Hawk") moves to dismiss On-Net Surveillance Systems, Inc.'s ("OnSSI") Amended Complaint [CM/ECF 21] and submits the following memorandum in support.

## I.   INTRODUCTION

This Court lacks subject matter and personal jurisdiction, OnSSI failed to join indispensable parties, venue is improper and the Amended Complaint fails to state a claim. While Hawk *has* sued OnSSI's customers for direct patent infringement, as declaratory Plaintiff OnSSI knows, Hawk never intended to sue OnSSI. Indeed, in connection with Hawk's first Motion to Dismiss [CM/ECF 19], Hawk covenanted not to do so. Unsatisfied, OnSSI filed an Amended Complaint [CM/ECF 21] seeking a declaration that its customers should not be liable for direct infringement. Tellingly, OnSSI never clearly alleges it has a duty to indemnify any specific customer for infringement of U.S. Patent No. RE 43,462 (the "Patent"). Nevertheless, OnSSI *erroneously* alleges it has standing because it has a reasonable apprehension of facing indemnity claims. Its error is not debatable. After a supplier has received a covenant not to sue, binding Federal Circuit case law holds that the apprehension of facing an indemnity claim is insufficient to create declaratory standing for the supplier. Further, there is no legal dispute between the parties. OnSSI's speculative "financial interest" based on a possible obligation to indemnify a customer is insufficient under the "legal interest" versus "financial interest" test used to determine standing. Consequently, OnSSI's Complaint should also be dismissed under Fed.R.Civ.P. 12(b)(1) and (6). There is no "definite" "case or controversy."

The Amended Complaint should also be dismissed under Fed.R.Civ.P. 12(b)(7). To explain, when a method claim is the subject of an infringement allegation, as it would be against

OnSSI's customers,[1] the customers/direct infringers are necessary and indispensable parties. Since they were not joined, the Amended Complaint should be dismissed. Finally, OnSSI's Amended Complaint does nothing to cure New York's lack of personal jurisdiction over Hawk and venue is still improper. Accordingly, the Complaint should also be dismissed pursuant to Fed.R.Civ.P. 12(b)(2)-(3). Finally, the exhaustion count fails because the Patent had already expired when Hawk covenanted not to sue OnSSI. Consequently, no sales were ever authorized. And, the covenant expressly reserves the right to sue direct infringers who use OnSSI's product.

## II.   FACTS

### A.   OnSSI Sued Hawk For A Declaration Of Non-Infringement, Invalidity, Intervening Rights, License and Exhaustion Related To U.S. Patent No. RE43,462 (The "Patent")

"This is an action for declaratory judgment of non-infringement, invalidity, intervening rights, a license to the '462 Patent, and exhaustion of Hawk's right to assert the '462 Patent against OnSSI's products or services." Amended Complaint at ¶ 1, CM/ECF 21.

### B.   Hawk Is A Florida Company, The Patent Prosecution Attorney Resides In Florida And Hawk Has No Offices Or Employees In New York

Hawk is a limited liability company organized and existing under the laws of the state of Florida. *See* Declaration of Marc Shulman (Hawk's Managing Member) attached hereto as Ex. A, ¶ 3, 4. It owns the Patent. *Id.* at ¶ 5. A Florida attorney of the law firm of Gifford, Krass, Sprinkle, Anderson & Citkowski, P.C. prosecuted the Patent application. *Id.* at ¶ 6. The inventors' names are Barry Schwab and Kinya Washino. *Id.* at ¶ 7. Mr. Schwab lives in Michigan. *Id.* Mr. Washino lives in New Jersey. *Id.* None of Hawk's owners reside in New York. *Id.* at ¶ 8. Hawk does not have any employees in New York. *Id.* at ¶ 9. Hawk does not

---

[1] The Covenant Not to Sue prohibits Hawk from suing OnSSI's customers for infringing any claim in the Patent other than infringing method Claim 12.

have any offices in New York. *Id.* at 10. Hawk has not sold any good or service in New York. *Id.* at ¶ 11. Further, Hawk does not own property in New York and does not regularly visit New York. *Id.* at ¶ 12. Finally, Hawk has never licensed the Patent in New York. *Id.* at ¶ 13.

### C. Hawk's Litigation History Makes Clear It Does Not Sue Video Management Software Manufacturers Such As OnSSI

Hawk has filed one hundred and fifteen cases across the country to enforce its rights under the Patent. *Id.* at ¶ 17. The Patent expired on April 29, 2014. *See* Patent attached as Ex. B. The Patent contains three independent claims: 1, 12, and 15. *Id.* Claims 1 and 15 relate to systems which require various components. *Id.* One of the components necessary to infringe Claims 1 and 15 is video management software ("VMS"), like OnSSI's Ocularis software. Third party hardware is needed to complete the infringing systems. *See id.* (It requires, among other things, cameras, computers, monitors and keyboards not sold by OnSSI). For reasons outside the scope of this paper, Hawk has only asserted infringement of Claim 12, which is a method claim, for the last six months. *See* Ex. A, at ¶ 14. OnSSI's Ocularis software performs one of the steps in the method claim 12. Just as with the system claims 1 and 15, third party hardware is needed to perform all of the steps in the claimed method. *See* Ex. B.

VMS manufacturers are not direct infringers merely because they sell VMS software. Instead, by selling VMS software, VMS manufacturers, like OnSSI, may be liable for indirect infringement, *i.e.*, contributory infringement or inducement. To obtain *damages* for indirect infringement, a patent owner must prove that the indirect infringer had actual knowledge of the patent and continued to indirectly infringe thereafter. *See Commil USA, LLC v. Cisco Sys., Inc.*, 135 S.Ct. 1920, 1926 (2015). There is no similar knowledge requirement to obtain damages from a direct infringer. *Id.* Consequently, Hawk has never sued VMS manufacturers. *See* Ex. A, at ¶ 15. Instead, Hawk has only sued VMS companies' end users. *Id.* at ¶ 16.

### D. **Hawk Covenants Not To Sue OnSSI**

Hawk submitted a covenant not to sue OnSSI for past, present or future direct or indirect patent infringement. *See* Ex. C.; CM/ECF 19-3.

### E. **Hawk's Only Contacts With New York Have Been Federal Court Lawsuits**

Of the one hundred and fifteen cases Hawk has filed, only seven were filed in federal courts located in New York and only five were in this District. *See* Ex. A, at ¶ 18. Of the suits Hawk filed in New York, only two were against OnSSI's customers and both have been dismissed. *Id.* at ¶19. Significantly, Hawk has sued nine of OnSSI's customers in federal courts outside of New York; however, three of those customers were not sued for using OnSSI's VMS software – instead, the claim charts in those cases were based on software produced by third party software manufacturers. *Id.* at ¶ 20. And, the first suit against one of OnSSI's customers was brought in the Southern District of Florida. *Id.* at ¶ 21. In connection with the present lawsuit, on October 21, 2015, Hawk's manager traveled to New York and met with OnSSI in an attempt to settle this case. *Id.* at ¶ 22. Other than its lawsuits, Hawk has had *no* contact with the State of New York. *Id.* at ¶ 23.

### F. **OnSSI Disclaims The Implied Warranty Of Non-Infringement In Its Form Customer Contract**

OnSSI disclaims the implied warranty of non-infringement in its form customer contract:

> Licensee is hereby notified that the Software, when used with certain equipment or other software, may enable it to perform surveillance actions and data processing which may be … infringing of others' intellectual property or patents… . ***The sole responsibility for verification of Licensee's use against compliance with applicable law, intellectual property rights or patents lies with the Licensee as the user.***

*See* Ex. D, at pp. 3 and 7. (Emphasis added.) OnSSI's Amended Complaint states that it has a duty to indemnify some of its customers. Significantly, however, the allegation is conclusory and unspecific. Indeed, OnSSI does not identify any specific customer or state what percentage

4

of its customers it must indemnify.  Moreover, OnSSI did not allege that Hawk has *ever* sued a customer that it had a duty to indemnify.  And, Hawk has sued eleven (11) of its customers.

### G. OnSSI Received A Customer Request For Indemnity And OnSSI Refused To Acknowledge Any Indemnity Obligation In Response

OnSSI's customer, CoxHealth ("Cox"), sent a letter to OnSSI requesting indemnity against an infringement claim brought by Hawk.  *See* CM/ECF 21-8, p. 2 (emphasis added).  Cox did not cite an indemnity agreement, but instead "section 2-312(3) of the Uniform [Commercial] Code...." *Id.* While it settled, OnSSI refused to acknowledge liability: "***The parties agree that the settlement of the Litigation and any payments related thereto shall not act as any acknowledgement of liability by either Cox or OnSSI.***" *See* CM/ECF 21-9 (emphasis added).

## III.   ARGUMENT

### A. This Court Does Not Have Subject Matter Jurisdiction And OnSSI Does Not State A Claim[2]

For a court to have subject matter jurisdiction over a declaratory judgment action, there must be an "actual controversy."  28 U.S.C. § 2201(a).  The dispute must be "definite and concrete . . . [i.e.,] real and substantial."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotations and alterations omitted).  When ascertaining whether jurisdiction

---

[2] *See Lake Minnewaska Mountain Houses, Inc. v. Lehman*, 88-CV-685, 1988 WL 142769, at *17 (N.D.N.Y. 1988) ("[P]laintiffs' federal claims are dismissed for declaratory judgment and injunctive relief under 12(b)(6) or lack of subject matter jurisdiction as there is no case or controversy...") *Hilton Hotels Corp. v. Damornay Antiques, Inc.*, 99 CIV. 4883 (MBM), 1999 WL 959371, at *1 (S.D.N.Y. 1999) (DAI moves to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) for lack of an actual "case or controversy.")

exists, courts must evaluate "all the circumstances." *Id.*   Proving one had a "reasonable

apprehension of being sued" is the most common way to satisfy the "all the circumstances" test.

*Streck, Inc. v. Research & Diagnostic Systems, Inc.*, 665 F.3d 1269, 1281-84, 101 U.S.P.Q.2d

1225 (Fed. Cir. 2012), cert. denied, 132 S. Ct. 2442, 182 L. Ed. 2d 1064 (2012).

Significantly, "jurisdiction must exist at all stages of review, not merely at the time the

complaint was filed." *Streck, Inc. v. Research & Diagnostic Systems, Inc.*, 665 F.3d 1269, 1281-

84, 101 U.S.P.Q.2d 1225, 1282 (Fed. Cir. 2012).  Consequently, "a patentee defending against an

action for declaratory judgment... can divest the trial court of jurisdiction over the case by filing

a covenant not to assert the patent at issue against the putative infringer." *Super Sack Mfg. Corp.

v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995); *accord Dow Jones & Co., Inc.

v. Ablaise Ltd.,* 606 F.3d 1338, 1348 (Fed. Cir. 2010) (same); *Arris Group, Inc. v. British

Telecommunications PLC*, 639 F.3d 1368, 1380 (Fed. Cir. 2011) ("[A] patentee's grant of a

covenant not to sue a *supplier* for infringement can eliminate the *supplier's* standing to bring a

declaratory judgment action.") (Emphasis added.)

## 1.  No Subject Matter Jurisdiction Exists Because There Is No Actual Controversy Between The Parties

"A useful question to ask in determining whether an actual controversy exists is what, if

any, cause of action the declaratory judgment defendant may have against the declaratory

judgment plaintiff[.]" *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir.

2007) (citing *Microchip Tech. Inc., v. Chamberlain Group, Inc.,* 441 F.3d 936, 943 (Fed. Cir.

2006)).  "The concepts of 'adverse legal rights' and 'legal risk,' used in [prior] cases to describe

the standard for jurisdiction require that there be an underlying legal cause of action that the

declaratory defendant could have brought or threatened to bring, if not for the fact that the

declaratory plaintiff has preempted it." *Id.*  Here, Hawk cannot sue OnSSI because Hawk covenanted not to do so.  *See* CM/ECF 19-3.

Further, Hawk could not have sued or threatened to sue OnSSI since "[t]o prove inducement of infringement . . . the patentee must show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement."  *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (*citing Global–Tech Appliances, Inc. v. SEB S.A.,* —— U.S. ——, 131 S.Ct. 2060, 2068, 179 L.Ed.2d 1167 (2011)).  Hawk has not and cannot allege that OnSSI had the requisite knowledge. Consequently, Hawk has no claim against OnSSI for inducing infringement and OnSSI cannot claim that it is at risk of being sued.  *See Microchip* at 942 ("Microchip's brief to this court states that it 'had a reasonable apprehension that ... it might thereby subject [its] *customers* to a patent infringement lawsuit by Chamberlain,' not that it had a reasonable apprehension of being sued as a patent infringer.") (Emphasis added).  OnSSI is a VMS manufacturer.  And, Hawk has *never* sued a VMS manufacturer.  Indeed, Hawk's litigation history evinces a clear intention *not* to sue VMS manufacturers.  OnSSI never had a reasonable apprehension of being sued and all the circumstances demonstrate that no substantial definite and actual controversy exists between the parties.

### 2. **OnSSI Does Not Have Declaratory Judgment Standing Merely Because its Customers May be Sued**

Hawk has sued OnSSI's customers.  However, that does not give OnSSI standing to seek a declaration.  "To the extent that Appellees argue that they have a right to bring the declaratory judgment action solely because their customers have been sued for direct infringement, they are incorrect." *DataTern* at 906.  Even when a patentee is litigious it does not give a *supplier* standing if the patentee's litigation strategy involves suing *end users*.  *Id* at 906-907.

### i.   OnSSI's Allegation Of An Obligation to Indemnify Is Conclusory And Unsupportable

OnSSI claims it "has an existing obligation to indemnify certain of its customers in connection with claims of infringement relating to OnSSI's products." Amended Complaint, ¶ 48. However, OnSSI fails to identify a single customer, contract, or clause requiring indemnification. And, as stated *supra*, OnSSI specifically disclaims the implied warranty of non-infringement in its form customer contract. Tying this to New York's implied warranty of non-infringement, §2–312(3), "the plaintiff-buyer must show: *(4) the parties did not form another agreement*." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.,* 777 F.Supp.2d 454, 461 (E.D.N.Y. 2011) aff'd in part, vacated in part, 720 F.3d 71 (2d Cir. 2013) (the Second Circuit did not disturb the quoted rule.) In other words, the merchant must not have disclaimed the implied warranty of non-infringement. But, that is exactly what OnSSI's form contract does. Without more, OnSSI's conclusory allegation of an obligation to indemnify is also legally insufficient. *See Microchip* at 944 ("Microchip has not produced any agreement indemnifying a customer ... Thus, Microchip has no legal right to 'clear the air.'")

### ii.   A Customer Request For Indemnification Is Insufficient.

OnSSI also claims that some customers have "demanded" indemnification and that OnSSI "has indemnified certain of its customers in connection with claims of infringement of the '462 patent brought by Hawk . . . ." *Id.* at ¶¶ 49, 50. However, the Federal Circuit "decline[d] Appellees' request to hold that their customers' indemnification request . . . alone can create standing . . . ." *DataTern* at 904 (emphasis added). *See e.g., Microchip* at 944; *Visto Corp. v. Sproqit Techs., Inc.,* No. C–04–0651 EMC, 2006 U.S. Dist. LEXIS 96173, at *15–16 (N.D.Cal. Oct. 4, 2006) (rejecting argument that covenant not to sue was insufficient because it did not

extend to, *e.g.,* customers; noting that accused infringer had not provided any evidence that it had an indemnification agreement with any customer).

Further, OnSSI's duty-to-indemnify allegations are inherently speculative and cannot support a finding that OnSSI has a reasonable fear that it will have to indemnify a customer. First, and significantly, it did not have an obligation with respect to any of its eleven customers Hawk has sued. Second, OnSSI failed to plead the percentage of its customers' agreements that do not include OnSSI's form waiver for non-infringement clause. Instead, OnSSI merely alleges it fears Hawk may sue one of its customers who has a non-form agreement. Since OnSSI did not specify which customers it has a duty to indemnify or what percentage of its customers it must indemnify, there is simply no way to ascertain whether its putative fear is reasonable or based on a remote possibility. Indeed, Hawk does not know the identity of the overwhelming majority of OnSSI's customers.

Thankfully, the Federal Circuit addressed these exact issues. In *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1341 (Fed. Cir. 2001), the court held a supplier's allegation that "it could be required to indemnify an entity that potentially could be held liable in a different case for infringing the '202 patent" was insufficient to create declaratory judgment standing. Just as here, the patent owner in the *Intellectual Property Development* ("IPD") case had brought numerous suits against TCI-Cablevision's customers. During a litigation between IPD and TCI-California, IPD agreed not to sue TCI-California. TCI-California was the supplier to putative direct infringers. The Federal Circuit opined that "[i]f TCI-California interests are affected by a different suit regarding the '202 patent, then TCI-California should join that action as a party, for example, pursuant to Federal Rule of Civil Procedure 19(a)(2)(i)." *Id.*

9

Contrary to OnSSI's allegations regarding the Cox settlement, OnSSI did not indemnify Cox. OnSSI merely settled without admitting liability.[3] "[T]he parties have made clear that to the extent" OnSSI has 'indemnified' Cox, "it has done so on a voluntary basis." *Shuffle Tech International, LLC v. Scientific Games Corporation*, 2015 WL 5934834 at *7 (N.D. Ill. 2015). "Without the indemnity agreement to support its argument," OnSSI's "argument is essentially that at some point in the future, it is possible that [Hawk] will either sue [OnSSI] (or some other future licensee of [OnSSI]) for infringement on a claim that is actually covered by a [OnSSI] indemnity agreement. Even under *MedImmune's* more lenient test, this sort of inchoate 'adverse legal interest' is too speculative to give rise to an actual controversy within the meaning of the Declaratory Judgment Act." *Id*. *See also Ours Tech., Inc. v. Data Drive Thru, Inc.*, 645 F. Supp. 2d 830, 839 (N.D. Cal. 2009) (citing *Microchip*) ("the lack of an indemnity agreement between OTI and its "customers" in the United States fails to carry any weight, let alone enough weight to create an adverse legal interest.")

### iii.    OnSSI's Mere Adverse Economic Interest Is Insufficient To Confer Standing

"Without an underlying legal cause of action, any adverse economic interest that the declaratory plaintiff may have against the declaratory defendant is not a legally cognizable interest sufficient to confer declaratory judgment jurisdiction." *Benitec Australia, Ltd.*, 495 F.3d at 1344 (Fed. Cir. 2007). *See also Ours Tech., Inc.*, at 840 ("DDT is correct that OTI's interest in this action is largely—if not exclusively—economic. Based on the facts alleged, under all of the circumstances, OTI has failed to show that there is 'a substantial controversy, between parties

---

[3] The Cox settlement cannot give OnSSI standing because it occurred after this suit was filed. *See DataTern* at 906.

having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."); *Microchip* at 943 ("At most, Microchip had only an economic interest in clarifying its customers' rights under Chamberlain's patents … Such an economic interest alone, however, cannot form the basis of an 'actual controversy' under the Declaratory Judgment Act.")

Here, at best, OnSSI's speculative interest is purely economic. "OnSSI has an objectively reasonable apprehension that Hawk will bring a patent infringement action *against its customers*, including customers who OnSSI has an obligation to indemnify, creating an objectively reasonable apprehension that *OnSSI will have additional indemnification obligations*." Amended Complaint, ¶ 52 (emphasis added).   OnSSI's concern over possible future indemnification obligations for its customers does not satisfy the necessary "underlying legal cause of action" requirement to confer declaratory judgment standing.  Because OnSSI's interest is purely economic, OnSSI has no standing.

### B.  Defendant Failed To Join An Indispensable Party

OnSSI's Amended Complaint should be dismissed pursuant to Rule 12(b)(7) because OnSSI failed to join the real parties in interest.  Under Fed. R. Civ. P. 17(a)(1), "[a]n action *must* be prosecuted in the name of the real party in interest."[4]    Here, since OnSSI's customers are "the *only* real part[ies] in interest under Rule 17, [they are] required and indispensable part[ies] under Rule 19." *Fagioli S.p.A. v. Gen. Elec. Co.*, 2015 WL 3540848, No. 14-cv-7055, *2–*5 (S.D.N.Y. June 2, 2015); *see also Brocklesby Transport v. Eastern States Escort Servs.*, 904 F.2d 131, 133 (2d Cir. 1990) ("Under federal law, … the only real party-in-interest … must sue in its own name.")

---

[4] None of the exceptions set forth in Fed. R. Civ. P. 17(a)(1)(A)–(G) apply.

These rules of law are particularly inflexible in this context because a "declaratory judgment, like any other judgment, is only *res judicata* to the parties to it," *Motor Vehicle Acc. Indem. Corp. v. Nat'l Grange Mut. Ins. Co.*, 270 N.Y.S.2d 245, 247 (N.Y. App. Div. 1966), and such a proceeding "may be maintained only where it will serve a useful purpose in clarifying and settling the legal relations involved...." *Caldwell Mfg. Co. v. Unique Balance, Co.*, 18 F.R.D. 258, 263 n.17 (S.D.N.Y. 1955); *White v. Nationwide Mut. Ins. Co.*, 644 N.Y.S.2d 590, 591 (N.Y. App. Div. 1996) (same).

Critically, here, there is no upside to this dispute for Hawk.  To explain, Hawk cannot *win* anything because OnSSI's customers would not be bound by the declaratory relief that OnSSI requests.  *See In re Old Carco LLC*, 530 B.R. 614, 620–21 (S.D.N.Y. 2015) ("[A] declaratory judgment will not serve a useful purpose because ... a declaratory judgment may not completely resolve the issue or eliminate any uncertainty because Verde is not a party and may not be bound by the declaratory judgment."); *Friedman v. Wahrsager*, 848 F.Supp.2d 278, 304 (E.D.N.Y. 2012) (dismissing a plaintiff's request for declaratory relief regarding the status and rights of Bank of America where Bank of America was not named as a party to the action.) Indeed, issue preclusion "does not bar someone charged with infringement from challenging the validity of patent claims that were upheld in a prior infringement suit to which it was not a party." *Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1091 (Fed. Cir. 1987). Further, "[a]s a matter of due process, each new defendant in a patent suit is entitled to make its own defense. There can be no collateral estoppel against a defendant who has not had a 'full and fair opportunity to litigate the claim' at issue." *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1571 (Fed.Cir.1993) (quoting *Blonder–Tongue Lab. v. Univ. of Illinois*, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)).

12

Further, OnSSI's customers directly infringing method claim 12 are "not mere customers, but indeed, 'necessary parties,'" as the court in *In re Laughlin* explains:

> Prior to the commencement of the declaratory judgment suit, the defendant-patentee had filed four separate patent infringement suits against companies that had purchased equipment from the plaintiff-manufacturer. In these four "customer suits," the patentee claimed that the manufacturer's customers were infringing its patent by carrying out the method or process taught in the patent. The plaintiff-manufacturer, in the declaratory judgment case, moved the court to enjoin the prior "customer suits." ... The court denied the motion, finding that, because the patent in suit was a method patent, the plaintiff-manufacturer ... could be held liable only as a contributory infringer, not a direct infringer. The 'customers,' therefore, were not mere customers, but, indeed, 'necessary parties' to the prior infringement suits.

*In re Laughlin Products, Inc.*, 265 F.Supp.2d 525, 537 (E.D. Pa. 2003), citing *Zemel Bros. v. Dewey Elecs. Corp.*, 218 U.S.P.Q. 722, 724 (N.D.N.Y. 1982).[5]

In short, OnSSI's customers are necessary parties and *must* be joined because their absence will leave Hawk "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a)(1)(B)(ii).

### C. **This Court Does Not Have Personal Jurisdiction Over Hawk**

Personal jurisdiction "is [ ] essential ..., without [it] the court is powerless to proceed...." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999). To survive a 12(b)(2) motion, "a plaintiff must make a prima facie showing that jurisdiction exists." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015). "First, the Court must determine whether, under New York law, there is personal jurisdiction . . .; [and] [s]econd, . . . whether 'an exercise of

---

[5] *In re Laughlin* and *Zemel Bros.* are distinguished by *Card Activation Techs. v. Pier 1 Imports, Inc.*, No. 09C2021, 2009 WL 2956926, at *4 (N.D. Ill. Sept. 14, 2009) on the basis that the customer agreed to be bound by the outcome of the manufacturer's declaratory judgment suit. That factual distinction does not exist here.

jurisdiction ... is consistent with federal due process...." *Wallert v. Atlan*, No. 14 Civ. 4099, 2015 WL 6459219, *7 (S.D.N.Y. Oct. 26, 2015) (citing *Grant River Enters. Six Nations Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005)); *see also Cohen v. BMW Invs. L.P.*, No. 15-cv-3154, 2015 WL 6619958, *3 (S.D.N.Y Oct. 30, 2015) (same). Significantly, "[t]he Court may rely on affidavits" and "will not draw argumentative inferences in the plaintiff's favor or accept as true a legal conclusion couched as a factual allegation." *Wallert*, 2015 WL 6459219 at *6, 11 n.8.

Under 28 U.S.C. § 1295, the Federal Circuit has exclusive jurisdiction over "any civil action arising under [...] any Act of Congress relating to patents...." Consequently, "Federal Circuit law governs the [Due Process analysis of] . . . personal jurisdiction in patent-related cases." *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1358 (Fed. Cir. 1998) (parenthetical added). However, the Federal Circuit applies "New York and Second Circuit law" for purposes of ascertaining whether long-arm jurisdiction exists under C.P.L.R. § 302. *Graphic Controls Corp. v. Utah Medical Products, Inc.*, 149 F.3d 1382, 1385-1386 (Fed. Cir. 1998) (this holding was the "question on which this appeal turns.")

### 1.  New York's Long-Arm Statute Does Not Reach Hawk

"[A] court ... can exercise personal jurisdiction ... based either on general jurisdiction, under New York Civil Practice Law and Rule § 301, or specific jurisdiction, under C.P.L.R. § 302." *Wallert*, 2015 WL 6459219 at *8. OnSSI's allegation that Hawk is subject to New York's general jurisdiction evinces a basic and fundamental misunderstanding of the law. In *Daimler AG v. Bauman*, 134 S.Ct. 747, 760 (2014), the Supreme Court made clear that states cannot exercise general jurisdiction over an entity that neither resides in or is domiciled in the state unless the entity's contacts are so overwhelming that it was "fairly regarded at home." Even a "substantial, continuous and systematic course of business" is not enough for general

jurisdiction.  All Hawk has ever done is file a few lawsuits in New York.  That activity is so far from what is necessary to support general jurisdiction that no further argument is necessary.

As for specific jurisdiction, under § 302(a)(1),  The New York Court of Appeals has "stressed that New York's long-arm statute 'does not confer jurisdiction in every case where it is constitutionally permitted." *Ehrenfeld v. Mahfouz*, 518 F.3d 102, 104 (2d Cir. 2008).  Further, a "defensive declaratory judgment action is not one that the courts of New York have regularly linked to section 302(a)(1) jurisdiction." *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 764 (2d Cir. 1983).  And, "in applying § 302(a)(1), New York courts have cautioned that defendants, as a rule, should be subject to suit where they are normally found, that is, at their pre-eminent headquarters...." *E-Z Bowz, LLC v. Prof'l Prod. Research Co., Inc.*, No. 00-CUV-8670, 2003 WL 22064259, *7 (S.D.N.Y. Sept. 5, 2003).

To establish personal jurisdiction under § 302(a)(1) jurisdiction, OnSSI must show (a) Hawk "transacts any business within the state or contracts anywhere to supply goods or services in the state" and (b) a "direct relation between the cause of action and the in-state conduct...." *Tamam v. Fransabank Sal*, 677 F.Supp.2d 720, 726 (S.D.N.Y. 2010) (citing *Beacon Enters.*, 715 F.2d at 764).  Toward that end, OnSSI alleges, Hawk conducted business by filing lawsuits in New York."  Here, OnSSI's allegations are insufficient as a matter of law.

### i.    Hawk Does Not Transact Business In New York

Personal jurisdiction does not exist "when a non-resident's only contact with the [Southern District of New York] involves petitioning the federal government...." *The Bank of New York v. First Millennium, Inc.*, No. 06-civ-13388, 2007 WL 1404433, *7 n.11 (S.D.N.Y. May 9, 2007).  "[A] person or entity that ... seeks redress before the federal or local courts ... is not thereby 'transacting business' for the purposes of the long-arm statute."  *Id.  Cf. Beacon*

*Enters.*, 715 F.2d at 766 (enforcing trademark rights against New York residents does not constitute a transaction of business within New York).

In *Ehrenfeld v. Mahfouz*, 518 F.3d 102 (2d Cir. 2008) the Second Circuit reported the answer to its certified question to the Court of Appeals of New York. In *Ehrenfeld*, an author brought a declaratory judgment action against a judgment debtor who won a defamation case in England. The judgment creditor was a defendant in pending cases in New York. The judgment creditor refused to waive its right to sue in New York to enforce its English judgment. In short, the court opined that using New York's court system to enforce foreign laws does not permit New York to assert personal jurisdiction over a plaintiff. It reasoned, "the future implications of potential enforcement of that judgment would 'not arise from defendant's invocation of the privileges' of New York laws, but 'from an English remedy and plaintiff's unilateral activities in New York.'" *Id.* at 104. The exact same rationale applies here. Hawk's New York federal court suits did not arise from its invocation of the privileges of New York's laws, but instead arose from its invocation of *federal* patent laws and the infringers' unilateral activities in New York. *Ehrenfeld* makes clear that Hawk's use of the federal court system to seek a remedy for infringement of its federal rights does not permit New York to exercise personal jurisdiction over it.

    **ii.    This Suit Does Not Arise Out Of Hawk's New York Lawsuits**

"[T]he plain language of § 302(a)(1) requires that plaintiffs' cause of action must arise out of some transaction conducted within the state, and requires a 'substantial nexus' between the cause of action and the defendant's activities in New York." *Pieczenik v. Dyax Corp.*, No. 00 cv 243, 2000 WL 959753, *4 (S.D.N.Y. July 11, 2000). Hawk has only filed two lawsuits in New York against OnSSI's customers. *See* Ex. A at ¶ 19. In total, Hawk has filed eleven

lawsuits against OnSSI's customers. *See* CM/ECF 21, at ¶ 40. In other words, less than 20% of Hawks' cases against OnSSI's customers have been filed in New York. First, OnSSI did not – and cannot – allege that it is legally obligated to indemnify either of the New York customers. Consequently, this action does not "arise out of" Hawk's New York suits. Therefore, specific jurisdiction under § 302(a)(1) fails because this suit does not "arise out of" Hawk's New York contacts. To the contrary, this suit arises out of OnSSI's fear that Hawk may sue one of the customers whom it must indemnify. And, there is no indication that any such customer resides in New York or could even be joined in this case.

Second, even if OnSSI had a duty to indemnify its customers, there is not a "substantial nexus" between Plaintiff's prior suits and this action. Consider the court's holding in *Pieczenik* at *4, "[P]laintiffs' infringement claims against Dyax would exist regardless of its [instate] agreements with Pall Corp. Thus, for jurisdictional purposes, the alleged connection between this action and the Pall Corp. agreement is tenuous at best, and is insufficient to create the requisite 'substantial nexus' under CPLR § 302(a)(1)." The same is true here. If proper, OnSSI's declaratory judgment suit would exist regardless of Hawk's New York suits. Hawk's first suit against an OnSSI customer was in Florida – not New York. And, the majority of Hawk's suits against OnSSI's customers have not been in New York. Accordingly, at best, the relationship to New York is tenuous – not "substantial" as is required.

Since New York's long-arm statute does not reach Hawk, the Court need not perform a due process analysis. Nonetheless, Hawk does not have minimum contacts with New York. *See Zeneca Ltd. v. Mylan Pharms., Inc.*, 173 F.3d 829, 831 (Fed. Cir. 1999) ("petitioning the national government does not 'count' as a jurisdictional contact in the personal jurisdiction analysis."); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille*, 937 F.2d 44, 51 (2d Cir.

1991) (it is unreasonable to assert personal jurisdiction on a non-resident who comes into the jurisdiction [merely] to participate in litigation as a plaintiff. . . .") Further, as explained in the long-arm analysis, OnSSI's suit does not "arise out of" Hawk's New York suits.

**D.   Venue Is Improper**

"Because this is a declaratory judgment action involving patent and copyright infringement, venue is governed by the general venue statute, 28 U.S.C. § 1391, rather than the specific statute for infringement actions, 28 U.S.C. § 1400." *Modern Computer Corp. v. Ma*, 862 F.Supp. 938, 946-947 (E.D. NY 1994). There are three permissible bases for maintaining an action in a particular venue. *See* 28 U.S.C. § 1391(b)(1)–(3). If none of the permissible bases are satisfied, the complaint must be dismissed. *See* Fed. R. Civ. P. 12(b)(3). The same standard of review as a 12(b)(2) motion is applied and the burden of proof falls on the plaintiff. *See Blauschild v. Tudor*, 31 F.3d 527, 530–31 (E.D.N.Y. 2014) (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005)). Plaintiff's Complaint is destined for 12(b)(3) dismissal because, as discussed below, none of the three permissible bases for sustaining venue are satisfied.

**1.   § 1391(b)(1) Is Not Satisfied Because Defendant Does Not Reside In This District**

The first basis upon which venue may be proper is if Defendant resides in this District. *See* § 1391(b)(1). An entity is deemed to reside where it has its principal place of business and where it is subject to personal jurisdiction. *See* § 1391(c)(2). As explained in the facts and arguments above, Defendant does not have its principal place of business in New York and is not subject to New York's personal jurisdiction.

2. **§ 1391(b)(2) Is Not Satisfied Because A Substantial Part Of The Events Giving Rise to Plaintiff's Request For Declaratory Relief Did Not Occur In This District**

The second basis upon which venue may be proper is if "a substantial part of the events or omissions giving rise to the claim occurred" in this District.  § 1391(b)(2).  First, the overwhelming majority of the OnSSI customers that Hawk previously sued were not located in New York.  Second, "in a declaratory judgment action for non-infringement and invalidation of a patent, a cease and desist letter [or enforcement lawsuit] cannot form the basis for venue under section 1391 on the grounds that the sending of the letter [or enforcement lawsuit] constitutes 'a substantial part of the events giving rise to the claim.'"  *Modern Computer Corp. v. Ma*, 862 F. Supp. 938, 947 (E.D.N.Y. 1994) (parentheticals added.)  "In such cases, the transaction at issue is the granting of the copyright or patent, and the source of the cause of action for non-infringement is the ownership and existence of the copyright or patent, not the sending of the cease and desist letter."  *Id. Accord, Database America, Inc. v. Bellsouth Advertising & Pub. Corp.*, 825 F.Supp. 1216 (D. N.J. 1993) (same); *Unistrut Corp. v. Baldwin*, 815 F. Supp. 1025 (E.D. Mich. 1993) (same); *Int'l Communications, Inc. v. Rates Technology, Inc.*, 694 F. Supp. 1347 (E.D. Wisc. 1988) (same); *KVH Indus., Inc. v. Moore*, 789 F. Supp. 69, 73 (D.R.I. 1992) (same).

3. **§ 1391(b)(3) Is Not Satisfied Because This Court Lacks Personal Jurisdiction Over Defendant And There Are Other Districts Where This Case May Be Brought**

The third basis upon which venue may be proper is if this District has personal jurisdiction over Defendant and "there is no district in which the action may otherwise be brought."  28 U.S.C. § 1391(b)(3).  First, this Court lacks personal jurisdiction over Hawk. Second, there are other districts in which this action may be maintained (*e.g.*, the Southern District of Florida, where Defendant is located).

### E.  **OnSSI's Exhaustion Count Should Also Be Dismissed Under Rule 12(b)(6)**

Although it is not necessary for this Court to reach this question, OnSSI's exhaustion count should be dismissed under Fed. R. Civ. P. 12(b)(6).  "Exhaustion is triggered only by a sale authorized by the patent holder." *Quanta Computer, Inc. v. LG Electronics, Inc.*, 533 U.S. 617 (2008).   First, the covenant not to sue was provided after the Patent expired.  Hawk did not authorize OnSSI to sell anything. The unauthorized sales occurred prior to the patent expiring. Moreover, Hawk only stated it would not sue OnSSI for infringement.  As explained, *supra*, Hawk cannot sue OnSSI in good faith for infringement because Hawk could not and cannot allege that OnSSI is liable for knowingly contributing to or inducing infringement of its Patent. Indeed, Hawk has no evidence that OnSSI knew of the Patent prior to its expiration.  In short, nothing in the covenant not to sue can be construed as authorizing OnSSI's sales.  Finally, the covenant not to sue expressly allows Hawk to sue OnSSI's customers for infringing method claim 12.

### F.  **OnSSI's Complaint Should Be Dismissed As A Matter of Equitable Discretion Under 28 U.S.C. § 2201(a)**

Under 28 U.S.C. § 2201(a), the Court has "unique and substantial discretion" to decline to entertain an action seeking declaratory relief.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).  "A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." *Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962) (per curiam) (quoting *Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948)).  Separately and apart from the bases set forth above, the Court can and should dismiss this action as an exercise of equitable discretion.  Hawk has nothing to gain from this declaratory action.  It would not, and now clearly cannot, consistent with Rule 11 counterclaim

for direct or indirect infringement.   Forcing Hawk to litigate this declaratory action with no

upside does not further the purpose of the Declaratory Act and is simply inequitable.

## IV.    **CONCLUSION**

For the foregoing reasons, Hawk respectfully requests that the case be dismissed with

prejudice.

Dated: January 7, 2016.

Respectfully submitted,

By:    */s/ Jacqueline M. James*
Jacqueline M. James, Esq.
The James Law Firm, PLLC
445 Hamilton Avenue
Suite 1102
White Plains, New York 10601
T: 914-358-6423
F: 914-358-6424
E-mail: jjameslaw@optonline.net
*Attorneys for Plaintiff*


## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 7, 2016, I electronically filed the foregoing with

the Clerk of the Court and all parties using the CM/ECF system.   Participants in the case who are

registered CM/ECF users will be served by the CM/ECF system.

By:    */s/ Jacqueline M. James*
Jacqueline M. James, Esq.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|   |   |   |
|---|---|---|
| ON-NET SURVEILLANCE SYSTEMS, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CASE NO. 1:15-CV-06653-JGK** |
| **v.** | ) | |
| | ) | |
| HAWK TECHNOLOGY SYSTEMS, LLC, | ) | |
| | ) | |
| **Defendant.** | ) | |

### DECLARATION OF MARC SHULMAN

I, Marc Shulman, declare:

1.    I am over the age of eighteen (18) and otherwise competent to make this declaration.

2.    The facts stated in this declaration are based upon my personal knowledge and, if called upon to do so, I will testify that they are true and correct.

3.    Plaintiff, Hawk Technology Systems, LLC, ("Hawk") is a limited liability company organized and existing under the laws of the State of Florida.

4.    I am the Managing Member of Hawk.

5.    Hawk owns U.S. Patent No. RE43,462 (the "Patent").

6.    A Florida attorney with the law firm of Gifford, Krass, Sprinkle, Anderson & Citkowski, P.C. prosecuted the Patent application.

7.    The inventors' names are Barry Schwab and Kinya Washino.  Mr. Schwab lives in Michigan and Mr. Washino lives in New Jersey.

8.    None of Hawk's owners reside in New York.

9.    Hawk does not have any employees in New York.

10.     Hawk does not have any offices in New York.

11.     Hawk has not sold any good or service in New York.

12.     Hawk does not own any property in New York and Hawk does not regularly visit New York.

13.     Hawk has never licensed the Patent in New York.

14.     Hawk has only asserted Claim 12, which is a method claim, for the last six months.

15.     Hawk has never sued VMS manufacturers.

16.     Instead, Hawk has only sued VMS companies' end users.

17.     Hawk has filed one hundred and fifteen cases across the country to enforce its rights under the Patent.

18.     Of the one hundred and fifteen cases Hawk has filed, only seven were filed in federal courts located in New York and only five were in the Southern District of New York.

19.     Of the suits Hawk filed in New York, only two were against OnSSI's customers and both have been dismissed.

20.     Hawk has sued nine of OnSSI's customers in federal courts outside of New York; however, three of those customers were not sued for using OnSSI's VMS software – instead, the claim charts in those cases were based on software produced by third party software manufacturers.

21.     The first suit against one of OnSSI's customers was brought in the Southern District of Florida.

22.     In connection with the present lawsuit, on October 21, 2015, Hawk's manager traveled to New York and met with OnSSI in an attempt to settle this case.

2

23.     Other than its lawsuits, Hawk has had _no_ contact with the State of New York.

Date executed: November 19, 2015

By:     _/s/ Marc Shulman_
        **Marc Shulman**

US00RE43462E

(19) **United States**
(12) **Reissued Patent**
Washino et al.

(10) Patent Number: **US RE43,462 E**
(45) Date of Reissued Patent: **Jun. 12, 2012**

(54) **VIDEO MONITORING AND CONFERENCING SYSTEM**

(75) Inventors: **Kinya Washino**, Dumont, NJ (US);
**Barry H. Schwab**, West Bloomfield, MI (US)

(73) Assignee: **Kinya (Ken) Washino**, Little Ferry, NJ (US)

(21) Appl. No.: **09/301,656**

(22) Filed: **Apr. 28, 1999**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **5,625,410**
    Issued: **Apr. 29, 1997**
    Appl. No.: **08/418,823**
    Filed: **Apr. 7, 1995**

U.S. Applications:
(63) Continuation-in-part of application No. 08/050,861, filed on Apr. 21, 1993, now Pat. No. 5,450,140, and a continuation-in-part of application No. 08/298,104, filed on Aug. 30, 1994, now Pat. No. 5,537,157.

(51) **Int. Cl.**
    *H04N 7/18* (2006.01)
(52) **U.S. Cl.** .................. 348/154; 348/552; 348/E5.022; 348/E5.042; 348/E5.043; 348/E5.108; 348/E5.111; 348/E7.016; 348/E7.049; 348/E7.079; 348/E7.081; 348/E7.083; 348/E7.086; 348/E9.038; 348/E9.039; 386/355; 386/E5.002; 386/E9.013; 375/240.11; G9B/27.01; G9B/27.051
(58) **Field of Classification Search** .................. 348/154, 348/552, 398; 375/240.11; 386/112; 358/342; *H04N 7/18*
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,995,620 A | 8/1961 | Burr | |
| 3,617,626 A | * 11/1971 | Bluth et al. ...................... | 386/4 |
| 3,811,008 A | 5/1974 | Lee | |
| 3,935,380 A | 1/1976 | Coutta | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    0494752    7/1992

(Continued)

OTHER PUBLICATIONS

McLeod, Automated Video Surveillance—Teaching an Old Dog New Tricks, S.P.I.E., Dec. 17, 1993.

(Continued)

*Primary Examiner* — Nhon Diep
(74) *Attorney, Agent, or Firm* — Gifford, Krass, Sprinkle, Anderson & Citkowski, P.C.

(57) **ABSTRACT**

A PC-based system for monitoring and storing representative images from video cameras may be utilized for security or other monitoring applications. Camera inputs from digital or analog sources are individually and independently digitized and displayed at a first set of image sizes, sampling rates, and frame rates, and may be stored in digital form on various recording media at a second set of image sizes, sampling rates, and frame rates, and these two sets of sizes and rates may or may not be identical. Provisions are included for adding detection or alarm systems which will automatically alter image size, sampling rate and/or frame rate of an individual input source, or activate other physical responses. In addition to security system monitoring, further applications of the invention are disclosed for process monitoring in manufacturing environments and also for applications in videoconferencing.

**40 Claims, 8 Drawing Sheets**



**US RE43,462 E**
Page 2

## U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,051,524 | A | 9/1977 | Baxter | | |
| 4,074,225 | A | 2/1978 | Vandeweghe | | |
| 4,120,004 | A | 10/1978 | Coutta | | |
| 4,138,694 | A | 2/1979 | Doi et al. | | |
| 4,198,656 | A | 4/1980 | Mathisen | | |
| 4,237,483 | A | 12/1980 | Clever | | |
| 4,324,401 | A | 4/1982 | Shubben et al. | | |
| 4,360,827 | A | 11/1982 | Braun | | |
| 4,458,266 | A | 7/1984 | Mahoney | | |
| 4,507,683 | A | 3/1985 | Griesshaber et al. | | |
| 4,510,526 | A | 4/1985 | Coutta et al. | | |
| 4,511,886 | A | 4/1985 | Rodriguez | | |
| 4,516,156 | A | 5/1985 | Fabris et al. | | |
| 4,616,319 | A | 10/1986 | Peters et al. | | |
| 4,618,894 | A | 10/1986 | Ichinoi | | |
| 4,630,110 | A | 12/1986 | Cotton et al. | | |
| 4,650,929 | A | * | 3/1987 | Boerger et al. | 348/14.09 |
| 4,654,703 | A | 3/1987 | Viera | | |
| 4,661,863 | A | 4/1987 | Ichinoi | | |
| 4,663,518 | A | 5/1987 | Borror et al. | | |
| 4,673,974 | A | 6/1987 | Ito et al. | | |
| 4,685,003 | A | 8/1987 | Westland | | |
| 4,686,698 | A | 8/1987 | Tompkins et al. | | |
| 4,691,248 | A | 9/1987 | Nishimoto | | |
| 4,692,806 | A | 9/1987 | Anderson et al. | | |
| 4,710,917 | A | 12/1987 | Tompkins et al. | | |
| 4,712,103 | A | 12/1987 | Gotanda | | |
| 4,729,044 | A | 3/1988 | Kiesel | | |
| 4,739,401 | A | 4/1988 | Sacks et al. | | |
| 4,768,090 | A | 8/1988 | Camps et al. | | |
| 4,772,945 | A | 9/1988 | Tagawa et al. | | |
| 4,777,526 | A | 10/1988 | Saitoh et al. | | |
| 4,777,527 | A | 10/1988 | Camps et al. | | |
| 4,811,408 | A | 3/1989 | Goldman | | |
| 4,812,924 | A | 3/1989 | Fukami et al. | | |
| 4,814,869 | A | 3/1989 | Oliver, Jr. | | |
| 4,823,207 | A | 4/1989 | Kobayashi et al. | | |
| 4,829,389 | A | 5/1989 | Fukuda | | |
| 4,847,829 | A | 7/1989 | Tompkins et al. | | |
| 4,849,486 | A | 7/1989 | Tsuchiya et al. | | |
| 4,873,573 | A | 10/1989 | Thomas et al. | | |
| 4,876,597 | A | 10/1989 | Roy et al. | | |
| 4,879,747 | A | 11/1989 | Leighton et al. | | |
| 4,884,898 | A | 12/1989 | Magnuson | | |
| 4,905,262 | A | 2/1990 | Eby | | |
| 4,931,868 | A | 6/1990 | Kadar | | |
| 4,937,685 | A | 6/1990 | Barker et al. | | |
| 4,942,464 | A | 7/1990 | Milatz | | |
| 4,943,854 | A | 7/1990 | Shiota et al. | | |
| 4,951,140 | A | 8/1990 | Ueno et al. | | |
| 4,961,211 | A | 10/1990 | Tsugane et al. | | |
| 4,962,473 | A | 10/1990 | Crain | | |
| 4,965,819 | A | 10/1990 | Kannes | | |
| D311,924 | S | 11/1990 | Loyd et al. | | |
| D312,649 | S | 12/1990 | Sakuta | | |
| 4,992,866 | A | 2/1991 | Morgan | | |
| 5,001,348 | A | 3/1991 | Dirscherl et al. | | |
| 5,012,334 | A | 4/1991 | Etra | | |
| 5,014,267 | A | 5/1991 | Tompkins et al. | | |
| 5,027,222 | A | * | 6/1991 | Shinbo et al. | 386/27 |
| 5,027,413 | A | 6/1991 | Barnard | | |
| 5,034,986 | A | 7/1991 | Karmann et al. | | |
| 5,040,067 | A | 8/1991 | Yamazaki | | |
| D322,084 | S | 12/1991 | Tabuchi | | |
| 5,095,196 | A | * | 3/1992 | Miyata | 235/382 |
| 5,097,328 | A | 3/1992 | Boyette | | |
| 5,103,306 | A | 4/1992 | Weiman et al. | | |
| 5,111,290 | A | 5/1992 | Gutierrez | | |
| 5,117,285 | A | 5/1992 | Nelson et al. | | |
| 5,128,776 | A | 7/1992 | Scorse et al. | | |
| 5,142,367 | A | 8/1992 | Hong | | |
| 5,144,661 | A | 9/1992 | Shamosh et al. | | |
| 5,150,212 | A | 9/1992 | Han | | |
| 5,179,449 | A | 1/1993 | Doi | | |
| 5,182,776 | A | 1/1993 | Suzuki et al. | | |
| 5,191,645 | A | 3/1993 | Carlucci et al. | | |
| 5,202,759 | A | 4/1993 | Laycock | | |
| 5,206,929 | A | 4/1993 | Langford et al. | | |

| | | | | | |
|---|---|---|---|---|---|
| 5,216,502 | A | 6/1993 | Katz | | |
| 5,218,672 | A | 6/1993 | Morgan et al. | | |
| 5,229,850 | A | * | 7/1993 | Toyoshima | 348/153 |
| 5,235,420 | A | 8/1993 | Gharavi | | |
| 5,237,408 | A | 8/1993 | Blum et al. | | |
| 5,237,648 | A | 8/1993 | Mills et al. | | |
| 5,243,418 | A | 9/1993 | Kuno et al. | | |
| 5,253,062 | A | 10/1993 | Ohta | | |
| 5,258,837 | A | 11/1993 | Gormley | | |
| 5,260,783 | A | 11/1993 | Dixit | | |
| 5,270,811 | A | 12/1993 | Ishibashi et al. | | |
| 5,272,527 | A | * | 12/1993 | Watanabe | 348/154 |
| 5,285,273 | A | 2/1994 | James et al. | | |
| 5,293,313 | A | 3/1994 | Cecil et al. | | |
| D347,839 | S | 6/1994 | Carota | | |
| 5,325,194 | A | 6/1994 | Natori et al. | | |
| D349,913 | S | 8/1994 | Morris | | |
| 5,335,013 | A | * | 8/1994 | Faber | 348/104 |
| 5,339,104 | A | 8/1994 | Hong | | |
| 5,339,393 | A | 8/1994 | Duffy et al. | | |
| 5,341,439 | A | 8/1994 | Hsu | | |
| D354,973 | S | 1/1995 | Hisatune et al. | | |
| 5,382,972 | A | 1/1995 | Kannes | | |
| 5,400,069 | A | 3/1995 | Braun et al. | | |
| 5,406,327 | A | 4/1995 | Guarnotta | | |
| 5,406,328 | A | 4/1995 | Chodos et al. | | |
| D358,812 | S | 5/1995 | Boyd | | |
| 5,422,989 | A | * | 6/1995 | Bell et al. | 345/689 |
| 5,446,002 | A | 8/1995 | Kukes et al. | | |
| 5,481,297 | A | * | 1/1996 | Cash et al. | 348/14.12 |
| 5,490,247 | A | 2/1996 | Tung et al. | | |
| 5,491,508 | A | 2/1996 | Friedell et al. | | |
| 5,491,511 | A | * | 2/1996 | Odle | 348/153 |
| 5,491,797 | A | 2/1996 | Thompson et al. | | |
| 5,502,576 | A | * | 3/1996 | Ramsay et al. | 358/444 |
| 5,509,009 | A | 4/1996 | Laycock et al. | | |
| D370,010 | S | 5/1996 | Clapp et al. | | |
| 5,515,099 | A | 5/1996 | Cortjens et al. | | |
| 5,517,236 | A | 5/1996 | Sergeant et al. | | |
| 5,521,634 | A | * | 5/1996 | McGary | 348/169 |
| 5,526,037 | A | 6/1996 | Cortjens et al. | | |
| 5,526,133 | A | * | 6/1996 | Paff | 386/117 |
| 5,548,324 | A | 8/1996 | Downs et al. | | |
| 5,568,183 | A | 10/1996 | Cortjens et al. | | |
| 5,583,565 | A | 12/1996 | Cortjens et al. | | |
| 5,589,878 | A | 12/1996 | Cortjens et al. | | |
| 5,598,208 | A | 1/1997 | McClintock | | |
| 5,598,209 | A | 1/1997 | Cortjens et al. | | |
| 5,604,341 | A | 2/1997 | Grossi et al. | | |
| 5,612,734 | A | 3/1997 | Nelson et al. | | |
| 5,619,995 | A | * | 4/1997 | Lobodzinski | 600/425 |
| 5,642,498 | A | 6/1997 | Kutner | | |
| 5,648,814 | A | 7/1997 | Munson | | |
| 5,649,255 | A | 7/1997 | Schieltz | | |
| 5,657,096 | A | 8/1997 | Lukacs | | |
| 5,659,692 | A | 8/1997 | Poggio et al. | | |
| 5,689,442 | A | 11/1997 | Swanson et al. | | |
| 5,729,471 | A | 3/1998 | Jain et al. | | |
| 5,737,011 | A | 4/1998 | Lukacs | | |
| 5,764,277 | A | 6/1998 | Loui et al. | | |
| 5,767,897 | A | 6/1998 | Howell | | |
| 5,774,674 | A | 6/1998 | Gutmann et al. | | |
| 5,818,514 | A | 10/1998 | Duttweiler et al. | | |
| 5,821,990 | A | 10/1998 | Rudt et al. | | |
| 5,825,413 | A | 10/1998 | Mullis | | |
| 5,841,763 | A | 11/1998 | Leondires et al. | | |
| 5,872,923 | A | 2/1999 | Schwartz et al. | | |
| 5,896,128 | A | 4/1999 | Boyer | | |
| 5,926,611 | A | * | 7/1999 | Yang et al. | 386/112 |
| 6,037,977 | A | 3/2000 | Peterson | | |
| 6,292,204 | B1 | 9/2001 | Carleton et al. | | |
| 6,469,746 | B1 | 10/2002 | Maida | | |
| 6,700,625 | B1 | 3/2004 | Fujii | | |
| 2002/0131505 | A1 | 9/2002 | Vidunas | | |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | | 4184761 | 7/1992 |
| JP | | 4373386 | A | 12/1992 |
| JP | | 5168760 | 7/1993 |

**US RE43,462 E**

Page 3

| | | |
|---|---|---|
| JP | 5227532 | 9/1993 |
| JP | 5346773 | 12/1993 |
| JP | 6004731 | 1/1994 |
| JP | 6006804 | 1/1994 |
| JP | 6044470 | 2/1994 |
| JP | 686289 | 3/1994 |
| JP | 6070040 | 3/1994 |
| JP | 6078269 | 3/1994 |
| JP | H670277 | 3/1994 |
| JP | 6096378 | 4/1994 |
| JP | 6141310 | 5/1994 |
| JP | 6266774 | 9/1994 |
| JP | H6303651 | 10/1994 |
| JP | 7067098 | 3/1995 |
| WO | WO-96/25710 | 8/1996 |

OTHER PUBLICATIONS

Hasegawa et al., Development and Picture Quality Evaluation of a Prototype Hi-Vision Coding System for Facility Monitoring, S.P.I.E., Sep. 16, 1994.

Darg, a New High-Speed Video System for Motion Analysis, I.E.E. E., Jun. 26-28, 1991.

Chang et al., A Remote Multi-Camera Visual Surveillance System Using Frame-Switching Technology, I.E.E.E., Oct. 5-7, 1988.

Cudworth, Modern Video Surveillance and Control Systems Using Digital Image Processing Methods, I.E.E.E., Mar. 31, 1992-Apr. 2, 1992.

Murtoviita et al., Visual Aids for Substation Monitoring and Security Control, I.E.E.E., Jun. 26-28, 1991.

Rangan et al., Designing An On-Demand Multimedia Service, Jul. 1, 1992.

Vicon Industries, Vicon Introduces The V5000DVM Digital Video Multiplexer, Vicon Industries, Apr. 15, 1992.

Pappageorge, The Secrets of CCTV, Security Management, Aug. 1, 1993.

Hayter et al., The Desk Area Network, ACM SIGOPS Operating Systems Review, Oct. 1991.

Point-of-sale monitoring downsizes for small venues, May 1993.

Newton, Picturing the Future of CCTV, Security Management, Nov. 1, 1994.

Rangan et al., Efficient Storage Techniques for Digital Continuous Multimedia, I.E.E.E., Aug. 1, 1993.

Barthel, Digital Storage Weighed for ATM Surveillance, American Banker, Feb. 22, 1994.

Carvahlo et al., Automated Detection of Intruders Using a Neural Network, S.P.I.E., Apr. 21, 1992.

Intellution's Plant TV Brochure Date unknown.

* cited by examiner

**U.S. Patent**     Jun. 12, 2012     Sheet 1 of 8     US RE43,462 E

*Figure 1*



10" TO 14" VGA MONITOR          OPTIONAL MONITOR

*Figure 2*



14" TO 17" SVGA MONITOR

**U.S. Patent**     Jun. 12, 2012     Sheet 2 of 8     US RE43,462 E

## Figure 3



15" TO 20" HIGH RESOLUTION

## Figure 4



20" TO 21" SUPER HIGH RESOLUTION MONITOR

**U.S. Patent**          Jun. 12, 2012          Sheet 3 of 8          US RE43,462 E

*Figure 5*



20" TO 21" SUPER HIGH RESOLUTION MONITOR

*Figure 6*



14" TO 17" SVGA MONITOR

Case: 1:16-cv-10395 Document #: 16-3 Filed: 01/27/17 Page 38 of 59 PageID #:171

Case 1:15-cv-06653-JGK   Document 26-2   Filed 01/07/16   Page 7 of 20



Case: 1:16-cv-10395 Document #: 16-3 Filed: 01/27/17 Page 39 of 59 PageID #:172

**U.S. Patent**          Jun. 12, 2012          Sheet 5 of 8          **US RE43,462 E**

*Figure 9*



*Figure 10*



**U.S. Patent**         Jun. 12, 2012         Sheet 6 of 8         US RE43,462 E

*Figure 11*



Case: 1:16-cv-10395 Document #: 16-3 Filed: 01/27/17 Page 41 of 59 PageID #:174

Case 1:15-cv-06653-JGK   Document 26-2   Filed 01/07/16   Page 10 of 20



Case: 1:16-cv-10395 Document #: 16-3 Filed: 01/27/17 Page 42 of 59 PageID #:175

Case 1:15-cv-06653-JGK   Document 26-2   Filed 01/07/16   Page 11 of 20

*Figure 15*

| Mode | Ref. Fig. | Monitor Diag. Size | Monitor Pixel Dim. | 240 x 180 | 320 x 240 | 400 x 300 | 480 x 360 | 640 x 480 | 800 x 600 | Recording Time (Hrs.) @ 1 fps @ 100:1 DAT: B&W/Color | 8-mm: B&W/Color |
|------|-----------|--------------------|--------------------|-----------|-----------|-----------|-----------|-----------|-----------|------------------|------------------|
| I | 1 | 10"-14" | 640 x 480 | | 4 | | | | | 960 / 480 | 1920 / 960 |
| II | 2 | 14"-17" | 1024 x 768 | | 9 | | | | | 480 / 240 | 960 / 480 |
| III | 3 | 15"-20" | 1280 x 1024 | | 8 | | | 2 | | 360 / 180 | 720 / 360 |
| IV | 4 | 20"-21" | 1600 x 1200 | | 25 | | | | | 180 / 90 | 360 / 180 |
| V | 5 | 20"-21" | 1600 x 1200 | | | 12 | 2 | | | 180 / 90 | 360 / 180 |
| VI | 6 | 14"-17" | 1024 x 768 | 8 | | | | | 1 | 240 / 120 | 480 / 240 |

US RE43,462 E

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# VIDEO MONITORING AND CONFERENCING SYSTEM

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

## REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of U.S. Ser. No. 08/050,861, filed Apr. 21, 1993 now U.S. Pat. No. 5,450,140 and Ser. No. 08/298,104, filed Aug. 30, 1994 now U.S. Pat. No. 5,537,157.

## FIELD OF THE INVENTION

This invention relates generally to video monitoring, and, more particularly, to such systems employing means for digitizing camera images for display at a first image size, sampling rate, and frame rate, and for digital storage at a second image size, sampling rate, and frame rate.

## BACKGROUND OF THE INVENTION

Existing systems for monitoring video signals from multiple sources either have relied upon switching means to sequence through each of the sources in a predetermined pattern, or else implement some form of "split screen" display, in which a conventional video monitor displays, for example, the output of four cameras, each occupying a portion of the display screen. Often, the video output is also supplied to signal storage means such as a VCR which is operated in a single-frame recording mode, providing a time-lapse record of the camera outputs. These types of systems are in common usage, and are well known in the art.

More recently, the availability of digital techniques for video signal processing and data compression has opened new video monitoring alternatives. Mathisen, for example, U.S. Pat. No. 4,198,656, describes a system employing a signal selector which is controlled by signal storage means, including a VCR functioning as a time-lapse frame recorder, and disc storage means functioning as a frame-store type device which provides continuity in the display while the selector is advancing through its sequence to the next signal source, or to the next recorded signal from one particular source. Each image is further provided with a digital code, which enables the image source to be identified upon playback.

Katz (U.S. Pat. No. 5,216,502) discloses a system for monitoring and recording transactions at multiple cashier lanes. According to the preferred embodiment, output signals from four cameras are fed to a four-quadrant multiplexer, which contains a frame store having provisions for reducing each camera image to one-quarter size and then displaying it in one of the four quadrants of the video monitor. The combined output signal is then recorded on a Video Cassette Recorder (VCR) to provide a more permanent record of the transaction. No description is given of the size-reduction method, but this kind of display may be implemented by employing a time-compression scheme for the horizontal lines, and eliminating alternate scan lines from the vertical dimension of the video frame. Data from the individual cash registers is encoded digitally, and then either recorded on lines of video in the vertical-interval or else recorded on the audio tracks of the VCR. The monitoring provisions include a video overlay generator, so that transaction information may be displayed concurrently with images of the event. Provisions are also included for selective recording of representative frames of video, as triggered by transaction events at individual cashier lanes. This further reduces the number of frames recorded, and extends the recording duration of the video cassette.

Neither of these two inventions disclose the use of image data compression schemes, nor of image resizing by digital means. Katz does disclose selective recording of frames of video, but only in analog form, and using conventional video recording means, such as a VCR.

Blum et al. (U.S. Pat. No. 5,237,408) disclose a system employing multiple interface circuit boards containing provisions for capturing and digitizing images from a plurality of cameras, further storing a slow-scan sequence of images for each camera in active buffer memory means as RAM on each of the interface boards. The display of these image sequences is preferably controlled by a PC with disk storage capabilities, and individual images selectively may be recorded on the hard disk, under operator control. Storage capacity is limited, however, because no image data compression is provided, and it is not practical to store large quantities or sequences of images. There are no provisions for automatic recording of images, nor any provision for storing these images in a data form differing from the display format image size.

Gormley (U.S. Pat. No. 5,258,837) discloses video compression means as a method for fitting multiple camera images within a single video display screen. However, Gormley clearly indicates that the system relies on fixed image-size compression of the digitized incoming video signal, and does not perform any kind of bandwidth compression. Provisions are included for storing images on a video recorder, but, as in other systems, these images are stored by taking the screen display as a whole, rather than storing independently constituted representations of the individual camera outputs.

In general, these conventional systems, regardless of the subsequent signal processing employed, accept analog video signals from the camera sources for input to the monitoring system. As such, these signals are susceptible to disturbances such as RF interference, ground-loop noise, and high-frequency signal loss due to long runs of coaxial cables. Automatic video switcher units sequence the source signals at a relatively slow rate, requiring as much as 16 seconds delay between successive viewings of a particular source when using a one source-per-second rate to sequence through 16 sources. When such a system is equipped with a time-lapse video recorder, the recording medium is expensive, has low resolution, and is limited in recording capacity.

Other systems, such as video conferencing arrangements, use multiple camera images and audio sources which are coordinated through electronic switching means and image display means, with interconnections between conferencing rooms locally or at remote sites via telephone lines or other communications links. Fabris et al. (U.S. Pat. No. 4,516,156) discloses a sophisticated implementation of such a system, employing satellite links for long-distance communications, a full range of camera remote controls (including lens controls and pan-tilt-head controls), and touch-screen monitor facilities for system controls of cameras and signal switching. This system, however, has no provisions for image storage, or any application of image data compression means coupled with display means or image storage means.

## SUMMARY OF THE INVENTION

The present invention implements an automated video monitoring system by way of a PC-based platform employing

US RE43,462 E

3

display windowing software, with camera sources being interfaced to an input circuit board which includes provisions for image data compression. Using a basic image size in pixels of 320×240, and optionally including color processing employing a Y-U-V 4:1:1 or 4:2:2 sampling technique, a range of performance standards are established. An economical simultaneous display of 4 sources in a 2×2 configuration on a conventional 10″ VGA-format (640×480 pixels) monitor may be upgraded to a more elaborate 24-source (plus one utility window, which also may be used as a graphical-based input source device for transmitting control commands to the individual cameras) display in a 5×5 configuration on a high-resolution 20″ (1600×1200 pixels) monitor. Other combinations are possible, including arrays of images of size 640×480 pixels or even 800×600 pixels, depending on the screen size of the display monitor and the capabilities of the video display adapter circuit card. In addition, not all image windows need to be of the same size, nor updated at the same rate, but rather they may be mixed and combined based on particular applications. Remote controls for the individual cameras may be implemented by way of windowing software and/or monitor touch-screen devices. Automatic sensing of particular events (representing security alarms, equipment or process disturbances, or a change in the person speaking in a videoconferencing environment) may be employed to cause reconfiguration by way of resizing the image or modifying the update rate of individual windows on the display screen, or by modifying the data format of recording images on a storage device.

Storage of images may be implemented by way of a tape back-up device, such as a DAT or 8-mm tape recorder, which are capable of storing as much as 960 hours of monitoring images, or by way of disk storage devices, preferably including removable disk drives such as magneto-optical disks or PCMCIA-compatible disk-drive modules. Images are preferably stored as a succession of data-compressed representations, corresponding to various window sizes sampled at diverse update rates; however, though the image representations need not be identical to the sizes and rates used for video monitors displaying the various images. In an alternative embodiment, cameras are provided with data compression means at the camera location, with a bi-directional data link providing control signals from the PC, and accepting data-compressed images from the cameras. Depending on the data rates selected, the transmission of these signals may be by means of coaxial cables, twisted-pair lines, or fiber-optic cables. These signals may alternatively be transmitted over internal PBX telephone lines, or over greater distances, including satellite links, as would be the case for remote monitoring of facilities or videoconferencing. The use of digital images allows the application of various useful techniques, such as digital noise reduction and motion-sensing, to trigger security alarms, for example.

It is an object of the invention to provide a more efficient method for monitoring camera outputs by means of a multiple-window display system implemented on a computer platform.

It is another object of the invention to provide an improved recording system for event-logging or security applications, by means of storing data-compressed digital images, including identifying information, which are more representative of events than typical analog time-lapse recordings, and further to implement this system on a computer platform.

It is a further object of the invention to provide extended recording time for event-logging or security applications by means of either tape-based, or disk-based, or both tape-based and disk-based data recording means.

4

It is yet another object of the invention to provide a system for remote monitoring of cameras by means of transmission of data-compressed digital images over communication links.

It is yet a further object of the invention to provide a convenient method of implementing videoconferencing facilities by means of a PC-based platform.

BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1-6 show various possible screen display configurations according to the invention;

FIG. 7 is a functional diagram of a PC-based system wherein plug-in printed-circuit boards implement digital processing for analog input signals;

FIG. 8 is a functional diagram of a plug-in printed-circuit board introduced with reference to FIG. 7;

FIG. 9 is a functional diagram of a universal camera adapter having digital output signals;

FIG. 10 is a diagram of an integrated camera system;

FIG. 11 is a functional diagram of a PC-based monitoring system adapted for videoconferencing at multiple remote locations;

FIG. 12 is an overhead view of a physical layout of the system of FIG. 11;

FIGS. 13A and 13B are drawings of a multiple-camera monitoring unit for table-top use in videoconferencing;

FIG. 14 is a side-view of an expanded multiple-camera monitoring unit implemented for videoconferencing;

FIG. 15 is a table listing a variety of possible operating modes, depending on computer monitor display facilities, in either a monitoring or a videoconferencing version of the invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention implements an automated video monitoring system by way of a PC-based platform employing display windowing software, with camera sources being interfaced to an input circuit board which includes provisions for image data compression. The basic video window size of 320×240 pixels from each camera source can be displayed on a variety of video monitors, in a number of formats, depending on system complexity. The preferred recording medium is a 4-mm helical-scan data cartridge, commonly referred to as a digital audio tape (DAT). Each tape cartridge is capable of storing 10 GB (gigabytes) of data. All recording times in the explanation below are based a data-compression ratio of 100:1, utilizing a 4:2:2 Y/U/V sampling method for color images. Other higher capacity media, such as 8-mm tapes capable of 20 GB of data storage, may be employed when longer times are desired.

FIG. 15 shows a variety of possible operating modes, depending on the particular implementation of the PC-based monitoring system. These six representative modes will be explained in detail with the understanding that the invention is by no means limited to the specific examples shown, and that many different alternatives are possible. It should be noted also that in certain of the implementations shown, the entire screen may not be occupied by the various windows, and any unused areas at the top, bottom, or sides may be utilized to display warning messages, control buttons, or other such facilities.

FIG. 1 shows a computer monitor display for a system configured in accordance with Mode I as listed in FIG. 15. Using a commonly available 14″ VGA-format computer monitor with a dimension in pixels of 640×480, four windows

US RE43,462 E

5

having a dimension in pixels of 320×240 may be displayed simultaneously. Recording this data at the rate of one frame per second (1 fps) in black and white (B/W) and with 100:1 data-compression on a 10 GB DAT tape provides approximately 960 hours of images per tape, or alternatively more than 480 hours of color images. A second monitor optionally may be used to display utility windows including various system operating controls, as, for example, camera pan, tilt, zoom, focus, and so forth.

FIG. 2 shows a computer monitor display for a system configured in accordance with Mode II as listed in FIG. 15. Using a 15" to 17" SVGA-format computer monitor with a dimension in pixels of 1024×768, nine windows, each having a dimension in pixels of 320×240, may be displayed simultaneously. Eight windows may be implemented as camera displays, and the ninth window may be used for the continuous display of the utility window, as described above. Recording of all eight windows at 1 fps will allow 480 hours of B/W images in this configuration per 10 GB DAT tape, or alternatively more than 240 hours of color images.

FIG. 3 shows a computer monitor display for a system configured in accordance with Mode III as listed in FIG. 15. Using a 17" to 20" high-resolution computer monitor with a dimension in pixels of 1240×1024, eight windows having a dimension in pixels of 320×240 may be displayed, in addition to two windows having a dimension in pixels of 640×480. One of these larger windows may be implemented as a utility window, and the other larger window may be implemented for sequential display of the eight camera inputs at full camera resolution having a dimension in pixels of 640×480. Recording all eight camera image windows, and also the input-scan window, at 1 fps will allow 360 hours of B/W images in this configuration per 10 GB DAT tape, or alternatively more than 180 hours of images in color.

FIG. 4 shows a computer monitor display for a system configured in accordance with Mode IV as listed in FIG. 15. Using a 20" high-resolution computer monitor with a dimension in pixels of 1600×1200, 25 windows with a dimension in pixels of 320×240 may be displayed simultaneously. Twenty-four windows may be implemented as camera displays, and one is implemented as a [the] utility window. Recording all twenty-four windows, and also the utility window, at 1 fps will allow 180 hours of B/W images in this configuration per 10 GB DAT tape. If color recording is desired, a 20 GB 8-mm data cartridge will allow 180 hours of color images.

FIG. 5 shows a computer monitor display for a system configured in accordance with Mode V as listed in FIG. 15. Using a 20" high-resolution computer monitor with a dimension in pixels of 1600×1200, twelve larger windows having a dimension in pixels of 400×300 may be displayed, as well as one large high-resolution window, with a dimension in pixels of 800×600, to display the sequentially scanned output of the camera images. Recording in this format at 1 fps will provide 180 hours of B/W images in this configuration per 10 GB DAT tape. If color recording is desired, a 20 GB 8-mm data cartridge will allow 180 hours of color images.

FIG. 6 shows a computer monitor display for a system configured in accordance with Mode VI as listed in FIG. 15. Using a 14" to 17" SVGA computer monitor with a dimension in pixels of 1240×1024, and implementing a smaller window size with a dimension in pixels of 240×180, eight windows are available for the camera image displays, and two large windows of 480×360 are available for sequentially-scanned camera images. Recording in this screen format at 1 fps allows 480 hours of B/W images in this configuration on a 20 GB 8-mm data cartridge, and allows 240 hours of images in color.

6

In any of the display configurations just described, it is also possible to use a video overlay technique to display the utility controls superimposed on the camera video. Regardless of which display or recording format is used, the PC based monitoring system includes various facilities and features, which will now be described in further detail.

In operation, the user need only observe the various display windows on the monitor screen, rather than concentrate on many monitors simultaneously, thereby reducing the risk of missing an important event. Since no video switcher is used in recording, and images from all sources are continuously recorded at the selected frame rate for each source, more information is recorded than in conventional analog systems, wherein events may be missed due to the sequential switching of input images. The digital format also improves the picture quality, as the signal-to-noise ratio will be higher than for analog systems. In addition, there is no loss of quality during recording or playback, and because the recording technique is digital, other types of information optionally may be recorded along with the camera data, such as audio, time, date, location, etc.

An additional feature is the capability to implement a dual-recording-media option. This facility provides the ability to record simultaneously both on a tape (for high capacity, long term storage) and also on a removable media, such as a removable hard disk (i.e. PCMCIA) or magneto-optical disk (for short-term storage of up to 24 hours of images). These disks facilitate high-speed searching of recorded information without interrupting the tape, as well as providing a back up for the recording on the tape. In addition, the system is capable of simultaneously searching the recorded images on the disk storage unit while continuing to store images on the tape storage unit.

It should be noted that there is no requirement that the image sizes or frame rates utilized for the video display match those utilized for the storage media. In practice, these two specifications may not agree, and will be determined by other factors, such as operator manipulation of the displayed image sizes or changes resulting from the detection of alarm conditions.

FIG. 7 shows a functional diagram of an analog input-digital processing card installed in the PC which allows the use of existing analog cameras and cables with the PC-based monitoring system. This card, which may be obtained from such manufacturers as Nova, Model No. V-SW, features four video inputs 2a-2d having balanced or differential input circuitry for good noise immunity (or optically-coupled inputs for fiber-optic cabling), four video amplifiers 4a-4d, a 4×1 video switcher 6 by which any one of the four video inputs may be selected as a signal source, and an analog-to-digital (A/D) converter 8. The recording of camera inputs is digital, however, there is no provision for remote control of camera functions such as pan, tilt, zoom, and so forth. If additional inputs are desired, multiple cards may be installed in the PC. The output of the A/D converter 8 is supplied to the graphics processor and image data-compression engine 10. This unit performs the various functions required to configure the image sizes and frame rates as specified by the equipment operator. Because the overall data recording bandwidth of the system is a factor in the selection of the individual picture data rates, computer software is provided to implement menu-driven management of the data bandwidth allocation to the various image sources. Based on this configuration, signals are provided to the video switcher 4 to facilitate the selection of the particular image sources as required. The data-compressed images are provided in digital form to the microprocessor data bus 12. The microprocessor unit (not shown) in

US RE43,462 E

7

turn provides control signals to the graphics processor 10 by way of this data bus, in accordance with the image data allocation configuration selected.

FIG. 8 is a functional diagram of a digital input/output-digital processing card which implements bi-directional digital communications to and from the camera/adapter unit over a single transmission line, thereby greatly reducing the cost of cable and installation, and allowing existing wiring to be used. Various implementations of this printed-circuit card are required, depending on the type of network interconnection media selected. In addition, system performance will depend on the type of network interconnection media. As an example, a fiber optic network will have a higher transmission rate and better signal quality than a telephone network. Interfacing technology for these communication methods are in common usage and well known in the art. This printed-circuit card also serves four cameras through inputs 52a-52d, and additional cards can be implemented if required. The bi-directional digital video and camera control data switcher 54 serves to select the individual image sources as explained in reference to FIG. 7. These source signals are then provided to the graphics processor and image data-compression engine 56, which provides similar functions to those provided by the graphics processor 10, discussed in reference to FIG. 7. The processed data-compressed images are then provided to the micropro-cessor data bus 60. However, in this implementation, the bi-directional nature of the data switcher 54 is exploited to provide full functional control of the camera facilities through the bi-directional controller 58. These functional controls include the cameras themselves (lens and exposure control) and the camera's physical mounting provisions (pan and tilt). The various control signals for these functions are those traditionally provided to these kinds of equipment, and these concepts are well known in the art. In an alternative embodiment, the individual cameras are each equipped with separate image data-compression facilities, utilizing such techniques as motion-JPEG or MPEG compression. In this case, control signals for these additional functions are provided from the microprocessor bus 60 through the bi-directional controller 58 and the data switcher 54.

FIG. 9 is a functional diagram of a digital output universal camera adapter. This is a fully digital version of the camera adapter as described in co-pending U.S. patent application Ser. No. 08/050,861, titled "PERSONAL-COMPUTER BASED VIDEO PRODUCTION SYSTEM" now U.S. Pat. No. 5,450,140. The A/D-converter, digital image data-compressor, and bi-directional interface camera adapter 100 accepts analog audio and video signals from the camera 102, and converts them to digital signals in anticipation of the transmission of these signals over the interconnection network 104. The camera adapter also receives camera control commands from the PC by means of the interconnection network, and translates them into the appropriate pan, tilt, zoom, focus and iris control signals for the particular camera equipment, including the camera lens 106 and the pan/tilt mounting facilities 108. In addition, the camera adapter also has inputs for several "alarm system" type sensors 110, as, for example, motion detectors, photocell detectors, or simple switches. These alarm signals are digitized, encoded, and then transmitted to the main PC by means of the [interconnection,network] *interconnection network*. Power is supplied for this equipment from a local source 112. This camera adapter is implemented to provide a full-function system, adaptable to all existing types of cameras and control equipment. However, because of the large number of interconnections involved in the adapter, camera, pan/tilt unit, and sensors, the installation process may be somewhat complicated.

8

By equipping an individual camera input with digital frame store capabilities, it is possible to detect an alarm condition based on deviations from the normal-state image scene. For example, if a camera is monitoring a door exit or an area of a warehouse aisle that is not utilized during evening hours, any change in the image would represent an alarm condition. To allow camera movement, this sensing process would be disabled during pan, scan, tilt, zoom, and other camera positioning controls, and the sensing would be re-enabled after camera positioning ceased, or by manual operator control.

FIG. 10 is a functional diagram of an integrated camera system according to the invention including means to overcome problems associated with having a physically separate camera, pan/tilt unit, and adapter unit. The integrated system includes a camera 150 with pan/tilt control, A/D converter, digital data-compression circuitry, and requisite interfacing circuitry. Such provisions are preferably included in the camera base structure 152, which simplifies installation, as no separate interconnecting cables are required. The integrated camera system optionally may include provisions for supplying electrical operating power from a network coaxial cable, and thereby may be implemented with only a single interconnecting cable. An integrated camera system of this type may be implemented in a physical package which is as small as the camera itself, since most of the electronics may be highly miniaturized by developing custom integrated circuits, including LSI, ASIC, DSP, and mixed-signal processing.

It will be appreciated that in any of these implementations, alarm or sensor signals may be utilized to automatically reconfigure the system operating mode, as, for example, increasing the frame rate or image size for an image source associated with the sensor which has initiated the alarm signal condition. As explained above, the displayed windows and image sizes may be reconfigured into an operating mode different from the reconfiguration of the digital storage mode. If desired, the operator may choose to allow the system to automatically adjust the compression ratio utilized for a particular window in response to alarm signal conditions. Alternatively, the compression ratio may be adjusted in response to the selection by the operator of a particular window for closer monitoring, by switching to an image window having larger dimensions in pixels. For some applications, the use of a resolution-independent data compression scheme, such as the "Fractal Compression" method of Iterated Systems, Inc., will be preferred, since images compressed by this method may be resized to fit larger or smaller windows as desired, without loss of apparent resolution. In addition, automatic switching of the audio signals associated with a particular window in response to alarm signal condition will enable the operator to fully investigate such events, and the audio signals may serve to attract the operate's attention to the event. Such switching optionally may be coupled with operator selections for monitoring purposes as well, and in both of these options may be integrated into the system previously described for recording the images, with or without any associated audio signals, onto the mass-storage media.

FIG. 11 illustrates a PC-based monitoring system implemented for videoconferencing at multiple remote locations. In this application of the invention, a main control center, shown generally as 200, is interconnected, by way of a network, with remote locations, shown generally as 204 to 210, designated as "1" through "N". The network 202 may be implemented by way of telephone lines (slow speed), ISDN Lines (medium speed), or alternatively coaxial cable or fiber optics cables (high speed). The higher speed implementations permit transmission at higher frame rates and higher image resolutions. As an alternative, wireless networks or micro-

US RE43,462 E

9

wave links optionally may be used. Network communication between the main and remote locations is bi-directional; the main computer receives audio, video, and sensor data from each of the remote locations, and transmits controls for camera pan, tilt, focus, zoom, and so forth. Audio and video communications for the system operators also is provided, by means of an additional camera and headset at each location.

The application of these PC-based monitoring techniques also may [he] *be* implemented in cases in which the central monitoring area may be located at some distance from the remote site. In this case, the physical hardware and networking facilities will follow the example shown in FIG. 11, with the understanding that "Location 1" through "Location IN" will now refer to separate monitoring for security applications or other monitoring purposes.

The purpose of the main control center is to manage multiple cameras at multiple locations. By monitoring and controlling the remote locations from a central location 220, the system may function without an operator at each location. Optionally, additional computers shown, by way of example, as 222 and 224 at the main location may be implemented to simplify the monitoring and control of the remote locations. The main control center stores the data from remote locations in the main control storage facilities, shown, by way of example, as 238, 240 and 242, using digital tape and removable media, including, by way of example, PCMCIA-based removable media or magneto-optical (MO) media. The images may be stored at various frame rates and resolutions, depending on the requirements for the intended use of the stored images. Intercom provisions as shown as 230, 232 and 234, facilitate the coordination of activities between the main control center and the various remote locations, and video camera units are provided at each of the computers, shown, by way of example, as 244, 246 and 248.

Each remote location includes a PC/monitor 250, with multiple video cameras, shown, by way of example, as 252 and 254, including provisions 256 for image and data storage utilizing digital tape and other removable media. This remote location may be operated under control from either the main location (as described above), or a local operator, or by specific software designed for automatic control. In the case of software-controlled operations, provisions are included for control to be assumed by the main control center, if necessary. As in the case of the main control computers, each of the remote computers is equipped with intercom facilities as 258 and video cameras as 260.

In the traditional videoconferencing situation, only one camera and monitor are used. Unfortunately, this results in an unnatural scene which provides the users with only a single viewing perspective. The use of a wide-angle camera lens which is needed to include many people seated around a table creates a distorted view, especially for those seated furthest from the camera. FIG. 12 shows an overhead view of the typical videoconferencing arrangement, including conference table 300, camera and monitor 302, and conference participants, shown as circles as 304.

Using the PC-based monitoring system, it is possible to create a video conference that presents a much more natural viewing appearance. As shown in FIG. 13A, a multiple-camera, multiple-display unit 310 [preferably] is preferably located directly on the conference table 312. This reduces the camera-perspective-distorting effects just described, because conference members 314 may be seated in a more comfortable and convenient position. The resulting video image is also much more natural. Each controller remote site computer-display section 322 (as described herein below) simul-

10

taneously shows all of the members participating in the remote conference, with an individual video window allocated for each participant, under control from the PC-based monitoring system operator. In practice, the remote site equipment operator will select one of the display operating modes as described in FIG. 15, depending on the number of subjects (camera views) and the capabilities of the remote site computer equipment. Optionally, an additional camera 316 fitted with a wide-angle lens will provide an overall view of the conference room, in accordance with more traditional systems.

To facilitate the aiming of the individual cameras for the participants, an arrangement such as that implemented at airport gates to assist the parking of airplanes (typically an "I" and an "O" formed of neon light tubes is utilized for airplane gate parking) optionally may be included. In this case, the two indicators are mounted so as to overlap only when viewed directly along the optical axis of the camera lens system. Thus, the camera position need only be adjusted so as to cause the indicators to overlap, thereby assuring that the camera correctly is aimed at the subject. A number of microphones 318 are situated around the conference table in locations suitable for proper audio coverage of the participants' speech.

FIG. 13B shows a side-view depicting the physical layout of each of the four sides of the multiple-camera, multiple-display unit 310. The top unit 320 houses the individual cameras (2 to 8 units) and associated electronics, optionally including aiming provisions as described herein above. An LCD display screen 322 shows the various camera images of the conference participants. Speakers located at positions 324 provide audio from the remote sites.

As shown in FIG. 14, the multiple-camera/display unit shown in FIG. 13B preferably is modular in construction including removable side panels, in order to facilitate expansion along either horizontal axis so as to accommodate any size or shape conference table, with each section of the unit serving up to four conference participants. In the preferred embodiment, the entire unit preferably is constructed so as to provide a low profile, by utilizing slanted LCD display panels 330 to create a minimum obstruction for the local conference participants. If a low profile design is not required, the display panels optionally could be larger, and mounted vertically. Until color LCD panels become more cost-effective, the display unit would be constructed with any of the currently available small LCD projector systems. Each conference location may include a designated PC operator, however, the implementation of the network connection facilitates control of the system from a remote location.

It should be noted that the implementation of the PC-based monitoring system is not limited to these examples of security systems or videoconferencing. Many alternative implementations, such as workplace, factory, production line, and process monitoring, would benefit from this system, and these alternative implementations should be considered to be within the scope of the invention.

We claim:

1. A video storage and display system, comprising:
[a plurality of] *one or more* video cameras, each outputting a signal representative of a video image;
means to receive the signals from each camera and digitally compress the images;
two forms of high-capacity storage media, one being randomly searchable while the other continues to store the digitally compressed image; and
a computer configured to receive the digitally compressed images, the computer being interfaced to the following devices:

US RE43,462 E

**11**

a display screen,

means to receive externally derived operator commands, and

the high-capacity storage media, and wherein the computer is programmed to perform the following functions:

    display the digitally compressed images from the cameras in different windows on the display screen, each window being associated with an update rate and dimensions in pixels,

    vary [the dimensions and the rate] *spatial parameters and temporal parameters* at which a particular image is updated in its window in accordance with one of the externally derived commands,

    store the digitally compressed images in the high-capacity storage [medium] *media*, and

    vary the [dimensions and the rate] *spatial parameters and temporal parameters* at which a particular image is stored in accordance with one of the externally derived commands.

**2.** The video storage and display system of claim **1**, further including means associated with the computer for controlling the operation of one or more of the video cameras.

**3.** The video storage and display system of claim **1**, wherein the means to digitally compress the image from a particular camera is disposed at the location of the camera.

**4.** The video storage and display system of claim **1**, wherein the means to digitally compress the image from a particular camera is disposed at the location of the computer.

**5.** The video storage and display system of claim **1**, further including a separate computer associated with each camera, the computers being networked together over a common communication bus, enabling an operator situated at a particular computer to display the images gathered by other cameras in separate windows on that operator's display screen.

**6.** The video storage and display system of claim **1**, wherein *one or both of* the high-capacity storage [medium] *media* comprises a magnetic tape.

**7.** The video storage and display system of claim **1**, wherein *one or both of* the high-capacity storage [medium] *media* comprises a magnetic disk.

**[8.** The method of simultaneously displaying and storing multiple video images, comprising the steps of:

    receiving video images from a plurality of sources;

    digitizing one or more of the images if not already in digital form;

    displaying at least certain of the digitized images in separate windows on a display device, using a first, predetermined frame rate and resolution associated with each window; and

    simultaneously storing the displayed images using a second, predetermined frame rate and resolution associated with each image.]

**9.** The method of claim [**8**] *12*, further including the step of receiving a command to set the frame rate and resolution associated with the display and storage of a particular image.

**10.** The method of claim **9**, wherein the command is based upon an operator input.

**11.** The method of claim **9**, wherein the command is based upon an external stimulus.

**12.** The method of simultaneously displaying and storing multiple video images, comprising the steps of:

    receiving video images *at a personal computer based system* from [a plurality of] *one or more* sources;

    digitizing [one or more] *any* of the images [if] *not* already in digital form *using an analog-to-digital converter;*

**12**

    displaying at least certain of the digitized images in separate windows on a *personal computer based* display device, using a first set of temporal and spatial parameters associated with each image in each window;

    [simultaneously storing the displayed images] *converting one or more of the video source images into a data storage format* using a second set of temporal and spatial parameters associated with each image*; and*

    *simultaneously storing the converted images in a storage device.*

**13.** The method of claim **12**, the temporal parameters including frame rate.

**14.** The method of claim **12**, the spatial parameters including image dimension in pixels.

**15.** A video storage and display system, comprising:

    [a plurality of] *one or more* video cameras, each outputting a signal representative of a video image;

    means to receive the signals from each camera and digitally compress the images; and

    a computer configured to receive the digitally compressed images, the computer being interfaced to the following devices:

        a display screen,

        means to receive externally derived operator commands including means for sensing a deviation from the normal-state image scene associated with at least one of the video cameras, the existence of the deviation being used as the basis for generating an externally derived command, and

        a high-capacity storage medium, and programmed to perform the following functions:

        display the digitally compressed images from the cameras in different windows on the display screen, each window being associated with an update rate and dimensions in pixels,

        vary [the dimensions and the rate] *spatial parameters and temporal parameters* at which a particular image is updated in its window in accordance with one of the externally derived commands,

        store the digitally compressed images in the high-capacity storage medium, and

        vary the [dimensions and the rate] *spatial parameters and temporal parameters* at which a particular image is stored in accordance with one of the externally derived commands.

**16.** *The video storage and display system of claim 1, wherein one or more video images or camera control signals are received through a network connection.*

**17.** *The video storage and display system of claim 1, wherein one or more of the high-capacity storage media comprises a removable or permanent magnetic disk, a removable or permanent magneto-optical disc, a removable optical disc or a removable or permanent semiconductor-based device.*

**18.** *The video storage and display system of claim 1, wherein the temporal parameters include frame rate and the spatial parameters include image dimension in pixels.*

**19.** *The method of claim 12, wherein one or more images or camera control signals are received through a network connection.*

**20.** *The method of claim 12, wherein the high-capacity storage medium comprises a removable or permanent magnetic disk, a removable or permanent magneto-optical disc, a removable optical disc or a removable or permanent semiconductor-based device.*

**21.** *The method of claim 12, including a display device associated with each source and a communication capability*

US RE43,462 E

**13**

enabling an operator situated at the display for one source to view images, in separate windows, gathered by one or more different source.

22. The video storage and display system of claim 15, further including a device for remotely controlling the operation of one or more of the video cameras.

23. The video storage and display system of claim 15, wherein one or more video images or camera control signals are received through a network connection.

24. The video storage and display system of claim 15, wherein the high-capacity storage medium comprises a removable or permanent magnetic disk, a removable or permanent magneto-optical disc, a removable optical disc or a removable or permanent semiconductor-based device.

25. The video storage and display system of claim 15, further including a memory for storing the sensed deviation information in conjunction with the image data.

26. The video storage and display system of claim 15, further including:

a computer and display device associated with each video camera; and

communication capability enabling an operator situated at the display device associated with one camera to view images, in separate windows, gathered by one or more different cameras.

27. The video storage and display system of claim 15, wherein the temporal parameters include frame rate and the spatial parameters include image dimension in pixels.

28. A video storage system, comprising:

one or more video sources, each outputing a signal representative of a video image;

means to receive the signals from each source and digitally compress the images;

two forms of a high-capacity video storage media; and

a computer interfaced to the following devices:

an input to receive externally derived operator commands, and

the high-capacity storage media, and

wherein the computer is programmed to perform the following functions:

store the digitally compressed images in the high-capacity storage media, and

vary the spatial parameters and temporal parameters at which a particular image is stored in accordance with one of the externally derived commands.

29. The video storage system of claim 28, wherein the high-capacity storage media include one medium being randomly searchable, and with the other being serially searchable.

30. The video storage system of claim 28, wherein one or more video images is received through a network connection.

31. The video storage system of claim 28, wherein the high-capacity storage media comprises a removable or permanent magnetic disk, a removable or permanent magneto-optical disc, a removable optical disc or a removable or permanent semiconductor-based device.

**14**

32. The video storage system of claim 28, wherein the temporal parameters include frame rate and the spatial parameters include image dimension in pixels.

33. A digital video recording and monitoring system configured for use with a display device, comprising:

one or more inputs for receiving video material characterized by having spatial parameters and temporal parameters;

circuitry for digitally compressing the video material;

a first video storage medium which is randomly addressable;

a second video storage medium which is serially addressable;

an output for delivering the video material to the display device;

a user control; and

processing hardware or software operative to perform the following functions under user control:

a) store the digitally compressed video material in one or both of the first and second video storage media, and

b) output the video material for monitoring to the display device.

34. The digital video recording and monitoring system of claim 33, wherein the processing circuitry is operative to simultaneously store the digitally compressed video material in the first and second video storage media.

35. The digital video recording and monitoring system of claim 33, wherein the first video storage medium is a magnetic disk.

36. The digital video recording and monitoring system of claim 33, wherein the second video storage medium is a magnetic tape.

37. The digital video recording and monitoring system of claim 33, wherein the processing circuitry further permits searching of the video material previously recorded on the first storage medium while continuing to store the material on the second storage medium.

38. The digital video recording and monitoring system of claim 33, wherein the spatial parameters and temporal parameters of the video material in the first or second storage medium are different from the spatial parameters and temporal parameters of the video material delivered to the display device.

39. The digital video recording and monitoring system of claim 33, further including one or more video cameras interfaced to the one or more inputs.

40. The digital video recording and monitoring system of claim 33, further including:

a plurality of video cameras interfaced to the one or more inputs; and

the video material from different cameras is visible in different windows on the display device.

41. The digital video recording and monitoring system of claim 33, wherein the temporal parameters include frame rate and the spatial parameters include image dimension in pixels.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : RE43,462 E | Page 1 of 2 |
| APPLICATION NO. | : 09/301656 | |
| DATED | : June 12, 2012 | |
| INVENTOR(S) | : Kinya Washino | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page - Abstract Item (57):

Line 5, After first Insert -- set of temporal and spatial parameters corresponding to a --

Line 7, After second Insert -- set of temporal and spatial parameters corresponding to a --

Line 8, After two Insert -- sets of temporal and spatial parameters corresponding to --

In the Specification:

At column 1, line number 21, After first Insert -- Set of temporal and spatial parameters corresponding to --

At column 1, line number 22, After second Insert -- set of temporal and spatial parameters corresponding to --

At column 3, line number 19, After to Insert -- utilize the same set of temporal and spatial parameters such that they need --

At column 3, line number 36, After representations Insert -- representing temporal and spatial parameters --

At column 3, line number 39, After to the Insert -- temporal and spatial parameters corresponding to the --

At column 4, line number 48, After based Insert -- on --

At column 6, line number 34, After requirement that Insert -- the temporal and spatial parameters corresponding to the --

At column 6, line number 37, After specifications Insert -- for the temporal and spatial --

At column 6, line number 57, After configure the Insert -- temporal and spatial parameters corresponding to the --

At column 8, line number 51, Delete "operate's" Insert -- operator's --

Signed and Sealed this
Twenty-third Day of April, 2013

*Teresa Stanek Rea*

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

**CERTIFICATE OF CORRECTION (continued)**                      Page 2 of 2
**U.S. Pat. No. RE43,462 E**

At column 8, line number 64, Delete "fiber-optics" Insert -- fiber optic --

At column 9, line number 14, Delete "IN" Insert -- N --


In the Claims:

At column 10, claim number 1, line number 64, Delete "image" Insert -- images --

At column 11, claim number 1, line number 13, Delete "updated" Insert -- [updated] *presented*

--

At column 12, claim number 15, line number 38, Delete "updated" Insert -- [updated]

*presented* --

## COVENANT NOT TO SUE

Hawk Technology Systems, LLC, the holder of U.S. Patent No. RE43, 462 ("the '462 Patent"), provides this Covenant Not to Sue to On-Net Surveillance Systems, Inc., to whom it covenants as follows:

1.     Hawk Technology Systems, LLC hereby covenants not to sue On-Net Surveillance Systems, Inc. for infringement with regard to the '462 Patent and all claims thereunder.  By so covenanting, Hawk Technology Systems, LLC intentionally abandons its past, present, and future right to prosecute all past, present, and future infringement claims against On-Net Surveillance Systems, Inc. with regard to the '462 Patent.

2.     Hawk Technology Systems, LLC further covenants not to sue any of On-Net Surveillance Systems, Inc.'s customers for infringement with regard to the '462 Patent, with the express exception for claims involving infringement of the method claim 12 of the '462 Patent. Hawk Technology Systems, LLC expressly reserves its right to sue On-Net Surveillance Systems, Inc.'s customers for infringing method claim 12 of the '462 Patent.  In all other respects, Hawk Technology Systems, LLC abandons its right to prosecute all past, present, and future infringement claims against On-Net Surveillance Systems, Inc.'s customers with regard to the '462 Patent.


Signed this 19th day of November, 2015.


By _____
Angela M. Lipscomb
Counsel for Hawk Technology Systems, LLC

**Ocularis Client 4.1SP Installer End User License Agreement:**

This license agreement is a legally binding agreement between you (either an individual or a single entity) and On-Net Surveillance Systems, Inc. ("OnSSI") for the: **Ocularis Client** component of the OnSSI Ocularis software product ("OnSSI Products"), which may include associated software parts, modules, media, printed materials, and online or electronic documentation. The Ocularis Client component will be referred to as "the Software Component" in the following.

By installing, copying, or otherwise using the Software Component, you agree to be bound by the terms of this agreement. If you do not agree to the terms of this agreement, do not install or use the Software Component. Instead you may return it, within 30 days, along with all associated material to your place of purchase for a full refund.

The Software Component is protected by copyright laws and international copyright treaties, as well as other intellectual property laws and treaties. Note that the Software Component is licensed to you, not sold.

* Installation and Use *

OnSSI hereby grants you the right to install and use an unlimited number of copies of the Software Component with the following restrictions:

1. The Software Component may only be used on computers running operating systems for which the Software Component was designed.

2. The Software Component may only be used in connection with the OnSSI Products. When used together with the OnSSI Products the Software Component may also be used together with other compatible OnSSI Products.

3. The use of the Software Component is further restricted by the End User License agreement of the OnSSI Products.

4. The Software Component and OnSSI Products may only be used for live or recorded video surveillance viewing and to access alerts for information purposes on property or land owned or controlled by you. The Software Component and OnSSI Products, for instance, may not be used for surveillance of your customer's or client's property or land, or a 3rd party entity monitoring or surveillance of  your property or land.

* Copyright *

All title, including but not limited to copyrights, in and to the Software Component and any copies thereof are owned by OnSSI. All rights not expressively granted are reserved by OnSSI.

* Prohibited Use *

This license does not cover use of the product for the purpose of, or in connection with, a violation of the human rights of any person as set out in the United Nations Universal Declaration of Human Rights. Any such use is prohibited and is a material breach of this EULA causing the whole license for the product to lapse immediately without notice rendering any further use of the product unlawful.

* No Warranties *

OnSSI expressly disclaims any warranty for the Software Component. The Software Component and any related documentation is provided "as is" without warranty of any kind, either expressed or implied, including, without limitation, the implied warranties or merchantability, fitness for a particular purpose, or

non-infringement. The entire risk arising out of use or performance of the Software Component remains with you as the user. You are notified that the Software Component, when used with certain equipment or other software, may enable you to perform surveillance actions and data processing which may likely to be restricted by or contrary to applicable law, or infringing of others intellectual property or patents, including without limitation data privacy and criminal law. The sole responsibility for verification of your use against compliance with applicable law or patents lies with you as the user.

* Limitation of Liability *

   The provisions of this paragraph are in effect to the maximum extent permitted by applicable law. In no event shall OnSSI or its suppliers be liable for any special, incidental, indirect, or consequential damages whatsoever (including, without limitation, damages for loss of business profits, business interruption, loss of business information, or any other pecuniary loss) arising out of the use of or inability to use the Software Component or the provision of or failure to provide proper support, even if OnSSI has been advised of the possibility of such damages. Absent any willful misconduct or gross negligence, OnSSI's entire liability under any provision of this agreement shall be limited to the amount actually paid by you for the Software Component.

* Miscellaneous *

   (a) You may make copies of the Software Component as may be necessary for backup and archival purposes. (b) You may not distribute copies of the Software Component to third parties. (c) You may not view the .Net or source code, reverse engineer, decompile, or disassemble any of the Software Component's parts except to the extent permitted by applicable law which cannot be contractually waived. (d) You may permanently transfer all of your rights for this Software Component, provided the recipient agrees to the terms of this Agreement and this transfer has been registered and confirmed by OnSSI.

* Termination *

   Without prejudice to any other rights, OnSSI may terminate this license agreement if you fail to comply with its terms and conditions. In such event you must destroy all copies of the Software Component.

* Governing Law *

   This Agreement shall be deemed a contract made under the laws of the State of New York, United States of America and, together with the rights and obligations of the parties hereunder, shall be construed under and governed by the laws of such state.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision hereof.

---

**Ocularis Client Installer**

**License Agreement**

Please read the following license agreement carefully.

**OnSSI**

\* No Warranties \*

  OnSSI expressly disclaims any warranty for the Software Component. The Software Component and any related documentation is provided "as is" without warranty of any kind, either expressed or implied, including, without limitation, the implied warranties or merchantability, fitness for a particular purpose, or non-infringement. The entire risk arising out of use or performance of the Software Component remains with you as the user. You are notified that the Software Component, when used with certain equipment or other software, may enable you to perform surveillance actions and data processing which may likely to be restricted by or

○ I accept the terms in the license agreement

○ I do not accept the terms in the license agreement

[ < Back ]  [ Next > ]  [ Cancel ]

---

**Ocularis Client Installer**

**License Agreement**

Please read the following license agreement carefully.

**OnSSI**

without limitation, the implied warranties or merchantability, fitness for a particular purpose, or non-infringement. The entire risk arising out of use or performance of the Software Component remains with you as the user. You are notified that the Software Component, when used with certain equipment or other software, may enable you to perform surveillance actions and data processing which may likely to be restricted by or contrary to applicable law, or infringing of others intellectual property or patents, including without limitation data privacy and criminal law. The sole responsibility for verification of your use against compliance with applicable law or patents lies with you as the user.

○ I accept the terms in the license agreement

○ I do not accept the terms in the license agreement

[ < Back ]  [ Next > ]  [ Cancel ]

**Ocularis Client 5.1 SP**

END USER LICENSE AGREEMENT

By installing, copying, or otherwise using this software, including, but not limited to, any associated software parts, software modules, software plug-ins, software patches, media, printed materials, and/or online or electronic documentation (collectively, the "Software"), you agree to be bound by the terms of this license agreement with On-Net Surveillance Systems, Inc. ("OnSSI") and shall hereinafter be referred to as the "Licensee". If you do not agree to the terms of this agreement, do not install or use the Software. Instead return it, within 30 days, along with all associated material to your place of purchase for a full refund.

As Licensee, you may be an individual or a legal entity. The Software is licensed, not sold, to you and is protected by copyright laws and international copyright treaties, as well as other intellectual property laws and treaties.

* Installation and Use *

OnSSI hereby grants Licensee the right to install and use the Software subject to the following terms, conditions and restrictions:

1. Licensee may only use the Software on computers running operating systems for which the Software was designed.

2. Licensee may only use and install each licensed copy of the Software with cameras that are owned and controlled exclusively by Licensee.

3. Licensee may only use the Software together with other compatible OnSSI products.

4. Licensee shall be registered with OnSSI as the end-user of the Software.

5. Licensee's use of the Software shall be further restricted by the End User License agreement of other OnSSI products licensed to Licensee.

6. If Licensee receives any updates or upgrades to the Software they shall be subject to the terms and conditions in this Agreement.

7. Licensee may use the Software only for live or recorded video surveillance viewing and to access alerts for information purposes on property or land owned or controlled by Licensee. The Software and other OnSSI Products, may not be used (i) by Licensee or any third party on Licensee's behalf for surveillance of any property that is not owned by Licensee (i.e. property or land owned by Licensee's customers or clients), or (ii) by any other party to monitor or surveil Licensee's property or land.

8. The Software may only be operated, directly or indirectly, by Licensee, Licensee's employees or people working for Licensee, including law enforcement authorities investigating incidents for Licensee. The Software may not be operated or used in any way by any person or entity that is not controlled by Licensee.

9. The Licensee may not use the Software to connect with more cameras, video streams or devices than the number of licenses purchased to connect to these cameras, video streams and devices. In the case of any discrepancy, OnSSI's records shall supersede any other record or document, such as paper licenses.

10. No right to recopy, sell, distribute, license, sub-license, alter, modify, disassemble, de-compile or reverse engineer any Software in any manner whatsoever is hereby given. Violation of these restrictions may result in severe civil and/or criminal penalties, as violators will be prosecuted to the maximum extent possible.

11. Licensee may not provide or disclose the Software to any third party and may not grant any right in the Software to others.

\* Copyright \*

All title, including but not limited to copyrights, in and to the Software, and any copies thereof, are owned by OnSSI. All rights not expressively granted are reserved by OnSSI.

\* Prohibited Use \*

This license does not permit use of the Software for the purpose of, or in connection with, a violation of the human rights of any person as set out in the United Nations Universal Declaration of Human Rights. Any such use is prohibited and shall be a material breach of this EULA causing the whole license for the Software to lapse immediately without notice rendering any further use of the Software unlawful.

\* Activation \*

After a grace period Licensee must perform a mandatory online or offline activation of the Software. Failing to activate the Software will result in disruption of operation.

\* Mandatory Activation \*

The license rights granted under this license agreement are limited to the thirty (30) days after Licensee first installs the Software unless Licensee supplies information required to activate its licensed copy in the manner described during the Software's setup sequence.   Licensee can activate the Software through the use of the Internet. Licensee may also need to reactivate the Software if Licensee modifies its computer hardware or alters the Software. There are technological measures in the Software that are designed to prevent its unlicensed or illegal use. Licensee agrees that OnSSI may use those measures.

\* Protection and Security \*

Licensee agrees to use its best efforts and to take all reasonable steps to safeguard the Software to ensure that no unauthorized person shall have access thereto and that no unauthorized copy, publication, disclosure or distribution in whole or in part, in any form, shall be made. Licensee acknowledges that the Software contains valuable confidential information and trade secrets and that unauthorized use and/or copying is harmful to OnSSI.

\* No Warranties \*

OnSSI expressly disclaims any warranty for the Software. The Software  and any related items or documentation are provided "as is" without warranty of any kind, either expressed or implied, including, without limitation, the implied warranties or merchantability, fitness for a particular purpose, or non-infringement. The entire risk arising out of use or performance of the Software shall remain with Licensee as the user. Licensee is hereby notified that the Software, when used with certain equipment or other software, may enable it to perform surveillance actions and data processing which may be restricted by or contrary to applicable law, or infringing of others' intellectual property or patents, including without limitation data privacy and criminal law. The sole responsibility for verification of Licensee's use against compliance with applicable law, intellectual property rights or patents lies with the Licensee as the user.

* Limitation of Liability *

   The provisions of this paragraph are in effect to the maximum extent permitted by applicable law. In no event shall OnSSI or its suppliers be liable for any special, incidental, indirect, or consequential damages whatsoever (including, without limitation, damages for loss of business profits, business interruption, loss of business information, or any other pecuniary loss) arising out of Licensee's use of or inability to use the Software or the provision of or failure to provide proper support, even if OnSSI has been advised of the possibility of such damages. Absent any willful misconduct or gross negligence, OnSSI's entire liability under any provision of this agreement shall be limited to the amount actually paid by Licensee for the Software.

* Miscellaneous *

   (a) Licensee may make copies of the Software as may be necessary for Licensee's backup and archival purposes. (b) Licensee may not distribute copies of the Software to third parties. (c) Licensee may not view the .Net or source code, reverse engineer, decompile, or disassemble any part of the Software except to the specific extent, if any, permitted by applicable law which cannot be contractually waived. (d) Licensee may permanently transfer all of Licensee's rights for this Software, provided (i) the recipient agrees to the terms of this Agreement and (ii) such transfer has been registered and confirmed by OnSSI.

* Termination *

   Without prejudice to or limiting any other rights it has or may have, OnSSI may terminate this license agreement if Licensee fails to comply with its terms and conditions. In such event Licensee must promptly destroy all copies of the Software.

* Governing Law *

   This Agreement shall be deemed a contract made under the laws of the State of New York, United States of America and, together with the rights and obligations of the parties hereunder, shall be construed under and governed by the laws of such state.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision hereof.

Ocularis Client Installer

**License Agreement**

Please read the following license agreement carefully.

OnSSI

\* No Warranties \*

OnSSI expressly disclaims any warranty for the Software. The Software and any related items or documentation are provided "as is" without warranty of any kind, either expressed or implied, including, without limitation, the implied warranties or merchantability, fitness for a particular purpose, or non-infringement. The entire risk arising out of use or performance of the Software shall remain with Licensee as the user. Licensee is hereby notified that the Software, when used with certain equipment or other software, may enable it to perform surveillance actions and data processing which may be restricted by or contrary to

○ I accept the terms in the license agreement

○ I do not accept the terms in the license agreement

< Back    Next >    Cancel

---

Ocularis Client Installer

**License Agreement**

Please read the following license agreement carefully.

OnSSI

particular purpose, or non-infringement. The entire risk arising out of use or performance of the Software shall remain with Licensee as the user. Licensee is hereby notified that the Software, when used with certain equipment or other software, may enable it to perform surveillance actions and data processing which may be restricted by or contrary to applicable law, or infringing of others' intellectual property or patents, including without limitation data privacy and criminal law. The sole responsibility for verification of Licensee's use against compliance with applicable law, intellectual property rights or patents lies with the Licensee as the user.

○ I accept the terms in the license agreement

○ I do not accept the terms in the license agreement

< Back    Next >    Cancel